# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WHISPELLS FOREIGN CARS, INC., et al.,  )
                                        )
            Plaintiffs,                 )
                                        )          Chief Judge Patricia E.
                                        )          Campbell-Smith
        v.                              )
                                        )          No. 09-315 L
THE UNITED STATES OF AMERICA,           )
                                        )
            Defendant.                  )


## LANDOWNERS' MEMORANDUM IN SUPPORT
## OF MOTION FOR ATTORNEY FEES
## AND LITIGATION EXPENSES


Respectfully submitted:                 MARK F. (THOR) HEARNE, II
October 11, 2016                        LINDSAY S.C. BRINTON
                                        MEGHAN S. LARGENT
                                        ARENT FOX, LLP
                                        1717 K Street, NW
                                        Washington, D.C. 20006

                                        112 S. Hanley Road, Suite 200
                                        Clayton, MO 63105
                                        Tel:  (314) 296-4000
                                        Fax:  (202) 857-6395
                                        thornet@ix.netcom.com
                                        lindsay.brinton@arentfox.com

                                        *Counsel for Landowners*

## TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ...................................................................................................1

    A.    History of this lawsuit ...............................................................................1

    B.    After prevailing, the owners now ask this Court to award an unadjusted lodestar fee that is supported by a wealth of evidence ...........................................3

ARGUMENT .....................................................................................................................8

    I.    The lodestar fee is "strongly presumed" to be a "reasonable attorney fee." ...........8

    II.    The hours devoted to this litigation by the owners' counsel are reasonable ........13

    III.    The lodestar fee is calculated using "prevailing market rates" for which there is "specific proof." ...........................................................................15

        A.    To be "objective and reviewable" the lodestar fee must be calculated using market rates for which the trial court has "specific proof." ..................................................................................15

        B.    The Supreme Court's decisions in Jenkins and Perdue direct this Court to calculate the lodestar fee using current rates ............................21

        C.    Unless this Court reimburses these owners' unadjusted lodestar fee the policy for which Congress adopted the URA will be frustrated ........23

CONCLUSION ...............................................................................................................26

## **TABLE OF EXHIBITS**

**Page(s)**

Exhibit 1 – Lathrop and Gage and Arent Fox Billing Entries and Litigation Expenses ........... 5, 13

Exhibit 2 – Declaration of Mark F. (Thor) Hearne, II ............................................ 5, 13, 14, 21, 22

Exhibit 3 – Declaration of Elizabeth Munno ........................................................... 5, 21, 22

Exhibit 4 – Declaration of Dr. Michael Kavanaugh .................................................... 4, 5, 18

Exhibit 5 – Declaration of Dr. Laura Malowane ............................................................ 5

Exhibit 6 – Supplemental Declaration of Dr. Laura Malowane ........................................ 5

Exhibit 7 – *PriceWaterhouseCoopers* survey and the *National Law Journal Billing Survey* ..................................................................... 6

Exhibit 8 – *Biery v. United States* hearing transcript excerpt ........................................ 7

Exhibit 9 – *Vienna Metro LLC v. Pulte Home Corporation*, Case No. 1:10-cv-00502-GBL-TCB, Memorandum Opinion and Order (E.D. Va. Aug. 24, 2011) ................................................................... 7

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. United States Dept. of Housing & Urban Dev.*,
441 U.S. 39 (1979) ...........................................................................................................24

*Barber* v. *Kimbrell's, Inc.*,
577 F.2d 216 (4th Cir. 1978) ...........................................................................................23

*Bell v. United Princeton Prop. Inc.*,
884 F.2d 713 (3rd Cir. 1989) ....................................................................................12, 16

*Biery v. United States*,
818 F.3d 704 (Fed. Cir. 2016) ...................................................................................19, 21

*Biery v. United States of America*,
Case No. 16-316, 2016 WL 4772359 (U.S. Aug. 26, 2016) ..............................7, 14, 19, 22

*Biery v. United States*,
No. 16-316 ........................................................................................................................19

*Blum v. Stenson*,
465 U.S. 886 (1984) ..............................................................................................9, 11, 15, 16

*Bywaters v. United States*,
670 F.3d 1221 (Fed. Cir. 2012) ..................................................................................12, 19

*Christensen v. Stevedoring Servs. of Am.*,
557 F.3d 1049 (9th Cir.2009) ..........................................................................................23

*City of Burlington v. Dague*,
505 U.S. 557 (1992) ...........................................................................................................8

*City of Riverside v. Rivera*,
477 U.S. 561 (1986) .........................................................................................2, 10, 11, 24

*Copeland v. Marshall*,
641 F.2d 880 (D.C. Cir.1980) (*en banc*) .......................................................................25

*Covington v. Dist. of Columbia*,
57 F.3d 1101 (D.C. Cir. 1995).........................................................................................16

*Design & Prod., Inc. v. United States*,
20 Cl. Ct. 207 (1990).......................................................................................................13

*Eley v. District of Columbia*,
    793 F.3d 97 (D.C. Cir. 2015)........................................................................17, 20

*Evans v. United States*,
    694 F.3d 1377 (Fed. Cir. 2012) ................................................................................3

*Gisbrecht v. Barnhart*,
    535 U.S. 789 (2002) ..................................................................................................8

*Haggart v. Woodley*,
    No. 15-1072 ...............................................................................................................4

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ...........................................................................8, 10, 11, 23, 26

*Interfaith Community Org. v. Honeywell Inter.*,
    726 F.3d 403 (3rd Cir. 2013)....................................................................11, 16, 17, 21

*Laffey v. Northwest Airlines*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd
    in part on other grounds*, *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.
    Cir. 1984), *overruled in part on other grounds en banc in Save Our
    Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988)............4, 18

*Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*,
    487 F.2d 161 (3rd Cir. 1973)...................................................................................21

*Lolley v. United States*,
    18 Cl. Ct. 498 (1989)................................................................................................13

*Loomis v. United States*,
    74 Fed. Cl. 350 (2006)..............................................................................................11

*Makray v. Perez*,
    2016 WL 471271 (D.D.C. Feb. 8, 2016) ..............................................................6, 20

*Mann v. United States*,
    2014 WL 3501454 (Fed. Cl. July 14, 2014) .........................................................9, 11

*Missouri v. Jenkins*,
    491 U.S. 274 (1989) ..................................................................................................9

*Nat'l Assoc. of Concerned Veterans v. Sec'y of Defense*,
    675 F.2d 1319 (D.C. Cir. 1982)...............................................................................16

*Newport News Shipbuilding & Dry Dock v. Holiday*,
    591 F.3d 219 (4th Cir. 2009) ...................................................................................23

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,*
  478 U.S. 546 (1986) (*Delaware Valley I*) ........................................................ 8, 9, 10, 16, 26

*Pennsylvania v. Delaware Valley Citizens Council for Clean Air,*
  483 U.S. 711 (1987) (*Delaware Valley II*) ............................................................................ 8

*Perdue v. Kenny A., ex rel. Winn,*
  559 U.S. 542 (2010) ........................................ 8, 9, 10, 15, 16, 21, 22, 24, 26

*Preseault v. Interstate Commerce Commission,*
  494 U.S. 1 (1990) ..................................................................................................... 1

*Sabo v. United States,*
  127 Fed. Cl. 606 (2016) ......................................................................................... 7

*Salazar v. District of Columbia,*
  123 F. Supp.2d 8 (D.D.C. 2000) (*Salazar I*) ................................................... 5, 19

*Salazar v. District of Columbia,*
  750 F. Supp. 27 70 (D.D.C. 2011)(*Salazar II*) ................................... 4, 18, 20, 21

*Salazar v. District of Columbia,*
  991 F. Supp. 2d 39 (*Salazar III*) ..................................................................... 4, 19

*Salazar v. District of Columbia,*
  30 F. Supp. 3d 47 (D.D.C. 2014) (*Salazar IV*) ................................................... 4

*Salazar v. District of Columbia,*
  809 F.3d 58 (D.C. Cir. 2015) (*Salazar V*) ..................................... 4, 17, 20, 25

*Shaw v. Library of Congress,*
  478 U.S. 310 (1986) ....................................................................................... 21, 22, 23

*St. Bernard Parish Government v. United States,*
  121 Fed. Cl. 687 (2015) ........................................................................................ 3

*United States v. Clarke,*
  445 U.S. 253 (1980) ........................................................................................ 13, 24

*United States v. Dickinson,*
  331 U.S. 745 (1947) ............................................................................................. 24

*Vienna Metro, LLC v. Pulte Home Corp.,*
  786 F.Supp 2d 1090 (E.D. Va., 2011) ................................................................. 7

*Walters v. Nat'l Ass'n of Radiation Survivors,*
  473 U.S. 335 (1985) ............................................................................................. 23

## Statutes

28 U.S.C. §1491 (Tucker Act)................................................................................1

Equal Access to Justice Act.................................................................................7

FOIA.......................................................................................................................6

Freedom of Information Act (FOIA), 5 U.S.C. §552.........................................6

Trails Act §1247(d) ............................................................................................14

Uniform Relocation Assistance and Real Property Acquisition Policies Act
    Section 4654(c).........................................................................................3, 4

## Other Authorities

115 Cong. Rec. 31533 (Oct. 27, 1969)..............................................................24

Fifth Amendment.................................................................................................1

91st Cong., 1st Sess., §201 (1969) .....................................................................24

CPI-adjusted *Laffey*-rate ...................................................................................19

Fex, Cecilia, *The Elements of Liability in a Trails Act Taking:  A Guide to the
    Analysis*, 38 Ecol. L. Q. 673 (2011) ........................................................3

Hearing Before the Subcomm. on National Parks of the S. Comm. on Energy and
    Natural Resources, 110th Cong. 29 (2008) (statement of Sen. Richard Burr,
    Member, Subcomm. on National Parks) ................................................25

Hearne, *et al.*, *The Trails Act: Railroading Property Owners and Taxpayers for
    More than a Quarter Century*, 45 ABA REAL PROPERTY, TRUST & ESTATE
    LAW JOURNAL (Spring 2010)....................................................................3

*Report of the Third Circuit Task Force on Court Awarded Attorney Fees*, 108
    F.R.D. 237 (1985).....................................................................................21

## STATEMENT OF FACTS

### A.     History of this lawsuit

In 2004 the government violated the Fifth Amendment and took three Florida landowners' property[1] without paying them *any* just compensation.  The only way these owners could vindicate their right to be justly compensated was to sue the federal government.[2]  Owners forced to bring an inverse condemnation lawsuit are "placed at a significant disadvantage" and must bear "the burden to . . . take affirmative action to recover just compensation.[3]

In May 2009 these owners brought this action seeking that just compensation they are guaranteed by the Constitution.[4]  These owners endured over two years of litigation to establish the government's obligation to compensate them.  This Court found the government liable for taking these three landowners' property.[5]

Following that, more than three years ago, the parties reached a tentative settlement of what compensation the government owed each of the three landowners for the value of that property the government took from each owner.[6]  And, since that time the parties have been trying to resolve the reimbursable attorney fees and expenses owed these three owners.  We have provided the government with our detailed time and expense records for this more than seven-year long litigation.

---

[1] Lawrence C. Alton, Jesse and Virginia Abrams, and Bama Sea Products, Inc. are the landowners filing this motion.

[2] *See Preseault v. Interstate Commerce Commission*, 494 U.S. 1 (1990), and 28 U.S.C. §1491 (Tucker Act).

[3] *United States v. Clarke*, 445 U.S. 253, 257 (1980).

[4] Doc. No. 1.

[5] *Whispell v. United States*, 100 Fed.Cl. 529 (Aug. 29, 2011).

[6] Doc. No. 224.

The settlement only resolved the compensation and interest the government owed these owners and did not resolve the government's liability for the URA-mandated attorney fees and litigation expenses.  This was because the government desired to separately determine attorney fees and expenses.  The owners and government cannot agree how to calculate the reasonable attorney fees and expenses.  It is therefore necessary for this Court to resolve this issue.[7]

These Florida families are not wealthy.  Were it not for Congress adopting a fee-shifting statute, these owners could not have endured (and prevailed in) this lengthy lawsuit against the federal government.  Without a fee-shifting statute, these landowners could not bring this taking claim.

The government, ultimately, agreed to pay these three Florida landowners a total of $130,000 for that land they took from these owners in 2004.  Yet the government caused these owners to incur almost one million dollars vindicating these owners' right to compensation.  The Justice Department has yet to tell us how many hours government lawyers worked opposing these Florida owners and how much the government spent in litigation expenses.[8]

The government and its *attaque à outrance* litigation strategy protracted this litigation, made this lawsuit much more costly and unnecessarily consumed this Court's resources.  "The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by plaintiff in response."  *City of Riverside v. Rivera*, 477 U.S. 561, 581, n.11 (1986).  More colloquially, when the government "calls the tune it must pay the piper."[9]

---

[7] Of course, we remain open to resolving this issue by settlement.

[8] Last month we submitted a FOIA request asking the Justice Department to provide its time and expense records for this litigation.  The Justice Department has not yet complied with that FOIA request.  We also requested the same information by discovery under Rule 26.

[9] "When it is time to pay the piper it is time to accept the consequences of a thoughtless or rash action. Or the phrase can mean that it is time to fulfill a responsibility or promise, usually after

The Federal Circuit does not like the Justice Department's frivolous and wasteful litigation strategy.  In *Evans v. United States*, 694 F.3d 1377, 1381 (Fed. Cir. 2012), the Federal Circuit rebuked the Justice Department.  "The Government, however, foregoing the opportunity to minimize the waste both of its own and plaintiffs' litigation resources, not to mention that of scarce judicial resources, opposed plaintiffs' motions to stay, insisting that the district court suits proceed despite the pending appeal."  694 F.3d at 1379.  The Federal Circuit found "[e]ven more puzzling is why the Government … pursued the course it chose in the district courts and in this appeal, seeking with every possible argument – even if so thin as to border on the frivolous – to avoid acquiescing in plaintiffs' effort to … proceed on the merits in the Court of Federal Claims."  *Id.*; similarly *see St. Bernard Parish Government v. United States*, 121 Fed. Cl. 687, 747 (2015) (Judge Braden criticized the Justice Department for its litigation strategy, stating, "[i]n contrast [to the "open, transparent, and helpful" Army Corps of Engineers], the Department of Justice pursued a litigation strategy of contesting each and every issue"); *see also* Hearne, *et al.*, *The Trails Act: Railroading Property Owners and Taxpayers for More than a Quarter Century*, 45 ABA REAL PROPERTY, TRUST & ESTATE LAW JOURNAL (Spring 2010), pp. 170-75 and Fex, Cecilia, *The Elements of Liability in a Trails Act Taking:  A Guide to the Analysis*, 38 Ecol. L. Q. 673 (2011).

### B.    After prevailing, the owners now ask this Court to award an unadjusted lodestar fee that is supported by a wealth of evidence.

Section 4654(c) of the Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) says this Court "*shall*" award owners a "reasonable attorney fee" and shall reimburse these owners' litigation expenses.  The Solicitor General emphasized the unique

---

the fulfillment has been delayed already."   Available at http://grammarist.com/usage/pay-the-piper/ (last visiting September 28, 2016).

mandatory command of this fee-shifting statute in its Supreme Court brief.  The Solicitor

General explained the URA differs from other fee-shifting statutes because it mandates an

attorney fee award upon settlement with the government as well as when this Court enters

judgment:

> [W]hile most fee-shifting provisions make awards discretionary, Section 4654(c)
> is phrased in mandatory terms, requiring … the Attorney General (when she
> settles a case without a court judgment) "*shall* determine and award" a sum to
> "reimburse [the takings] plaintiff" for his reasonable litigation expenses.

*Haggart v. Woodley*, No. 15-1072,
United States Brief in Opposition, p. 10.[10]

After prevailing on the merits, including a finding by this Court that the government was

liable, and achieving a settlement in which the government agreed to pay compensation, the

owners now submit their attorney fees and expenses.  We ask this Court to enter an order

reimbursing these owners' unadjusted lodestar fee and actual out-of-pocket expenses.  The

lodestar fee was calculated for work at two different law firms.  For the fees incurred at Lathrop

and Gage, the fees are calculated using the *Laffey* Matrix.[11]  Thus, as Dr. Kavanaugh notes in his

declaration (Exhibit 4), the   *Laffey* Matrix can be used to approximate these fees for the

Washington D.C. market.  For the fees incurred at Arent Fox (a Washington D.C. based firm),

we calculated the fees using the usual hourly rates Arent Fox charges private clients for similar

---

[10]  Citations omitted.  Emphasis by Solicitor General.  Available at: <https://www.justice.gov/sites/default/files/osg/briefs/2016/05/26/15-1072_haggart_v._woodley_opp.pdf> (last visited September 26, 2016).

[11]  The *Laffey*-rates are a schedule of hourly rates for legal services originally established in *Laffey v. Northwest Airlines*, 572 F. Supp. 354, 371 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C. Cir. 1984), *overruled in part on other grounds en banc in Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988).  *See Salazar v. District of Columbia*, 123 F. Supp.2d 8 (D.D.C. 2000) (*Salazar I*), *Salazar v. District of Columbia*, 750 F. Supp. 27 70 (D.D.C. 2011) (*Salazar II*); *Salazar v. District of Columbia*, 991 F. Supp. 2d 39 (*Salazar III*); *Salazar v. District of Columbia*, 30 F. Supp. 3d 47 (D.D.C. 2014) (*Salazar IV*); and *Salazar v. District of Columbia*, 809 F.3d 58 (D.C. Cir. 2015) (*Salazar V*).

complex federal litigation.   A wealth of evidence including detailed billing records, expert declarations, and market surveys demonstrate the lodestar fee is reasonable.   Through August 2016 the total fee is $998,402 and the out-of-pocket litigation expenses are $10,860.   This is a fair, just and reasonable amount supported by the following evidence:

- Detailed billing records and invoices for all litigation expenses through August 2016 (Exhibit 1).

- The declaration of the owners' lead counsel, Thor Hearne, explaining that the lodestar fee is consistent with prevailing market rates charged (and paid by) private clients (Exhibit 2).

- Elizabeth Munno's declaration (Exhibit 3).   Munno is Arent Fox's chief financial officer. Munno testified that Arent Fox is a Washington, D.C.-based law firm, and the hourly rates Arent Fox charged in calculating the lodestar fee "are consistent with market conditions" and are the usual and customary rates Arent Fox charges private clients in comparable complex federal litigation.   Exhibit 3 para. 3, 5.

- Dr. Michael Kavanaugh's declaration, an economist and expert (Exhibit 4).   Dr. Kavanaugh's method of adjusting the *Laffey* Matrix was first adopted in *Salazar v. District of Columbia*, 123 F. Supp.2d 8 (D.D.C. 2000) (*Salazar I*), and has been followed by the D.C. Circuit, Third Circuit and the District Court for the District of Columbia and favorably cited by the Federal Circuit.

- Two declarations of Dr. Malowane, an expert on law firm economics (Exhibits 5 and 6). Malowane was the Justice Department's expert witness in at least three prior attorney fee lawsuits.   Dr. Malowane testified Arent Fox's rates "are competitive with market rates." Exhibit 5 para. 24.   The DC District court later relied upon Malowane's testimony to

5

adopt *Salazar*-adjusted *Laffey*-rates.  *Makray v. Perez*, 2016 WL 471271 (D.D.C. Feb. 8, 2016).

- Two surveys of prevailing market rates – the 2016 *PriceWaterhouseCoopers* survey and the 2014 *National Law Journal Billing Survey* (Exhibit 7). These surveys demonstrate that, although Arent Fox is one of the top-fifty Washington DC, firms, Arent Fox's hourly rates are consistent with, *or lower than*, the hourly rates charged by comparable firms.[12]

- We requested the Justice Department provide their records for time government lawyers spent on this lawsuit and the litigation costs the government incurred.  *See* Doc. No. 226. We requested the government provide this information under both FOIA[13] and this Court's discovery rules.  *Id.*  The government continues to refuse to provide this information.  We did not want to further delay resolution of this case so we filed this motion while reserving the opportunity to supplement this fee request with the government's time and expenses records when the government finally provides these records.[14]

---

[12] In 2014 Arent Fox's high and low hourly billing rate for partners was $660 and $500 and for associates was $595 and $275.  *See* Exhibit 7.  This is slightly less than the rates other Washington DC-based firms charged which were between $1,250 and $355 for a partner and between $860 and $210 for associates (excluding a $75 associate "low" for Wilmer Cutler Pickering Hale that appears to be a typographical error because it is far below market).  In 2016 Arent Fox's billing rates were similarly consistent with or slightly below rates comparable firms charged.  *Id.*

[13] Freedom of Information Act (FOIA), 5 U.S.C. §552.

[14] In addition to asking this Court to compel the government to provide this information, we have also reserved the opportunity to pursue an action to enforce the FOIA request in DC District Court.

- In an earlier Trails Act litigation the government agreed Arent Fox's 2013 rates of between $706 and $375 were consistent with then-prevailing Washington DC, rates.[15] The supporting evidence confirms Arent Fox's 2016 rates of between $855 and $210 are consistent with the prevailing market rates for complex litigation in Washington DC.

- The hourly rates used to determine the lodestar fee are consistent with or lower than those rates adopted by this Court and the District Court for the Eastern District of Virginia used to calculate a lodestar attorney fee. In *Sabo v. United States*, 127 Fed. Cl. 606, 637 (2016) Judge Sweeny found that for work between 2011 and 2015, "Morgan Lewis typically billed at hourly rates between $410 and $825."[16] Similarly, in *Vienna Metro, LLC v. Pulte Home Corp*., 786 F.Supp 2d 1090 (E.D. Va., 2011) the District Court adopted a matrix of rates for complex federal litigation in Northern Virginia that is very similar to (actually slightly higher than) the *Salazar*-adjusted *Laffey*-rates. The order awarding attorney fees is attached as Exhibit 9. Under this *Vienna-Metro*-Matrix, the prevailing rates in Northern Virginia in 2010 ranged from $250 to $415 for a lawyer with one to three years of experience and $505 - $810 for a lawyer with more than twenty years of experience.[17] In 2011 these rates ranged from $250 to $435 and $505 to $820 respectively. The District Court used this matrix as the basis for its fee award to the Kirkland Ellis law firm.

---

[15] In *Biery* the government's lawyer, Kris Tardiff, admitted, "I think the Court can probably just accept for that purpose only the forum rates (for Washington DC) as plaintiffs are arguing them to be." Exhibit 8 (hearing transcript).

[16] *Sabo* involved a fee award under the Equal Access to Justice Act which caps the hourly rates. The URA has no cap on hourly rates.

[17] Exhibit 9, p.12

**ARGUMENT**

**I.      The lodestar fee is "strongly presumed" to be a "reasonable attorney fee."**

A reasonable attorney fee is the amount private clients pay an attorney of similar skill, experience, and reputation for comparable work.  "In computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, for all time reasonably expended on a matter." *Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* 483 U.S. 711, 725 (1987) (*Delaware Valley II*) (quotations omitted).  A reasonable attorney fee under fee-shifting statutes must be "sufficient to induce a capable attorney to undertake the representation . . . ."  *Perdue v. Kenny A., ex rel. Winn*, 559 U.S. 542, 552 (2010).

The lodestar method is the presumptive standard.  "The 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence."  *Gisbrecht v. Barnhart,* 535 U.S. 789, 801 (2002). "[T]he most useful starting point for [determining] a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Id*. at 802 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 437 (1983)).  "The lodestar method yields a fee that is presumptively sufficient to achieve this objective [of inducing capable counsel to undertake the representation]."  *Perdue*, 559 U.S. at 552.  "We have said that the [lodestar] presumption is a 'strong' one."  *Id.* (citing *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992), and *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986) (*Delaware Valley I*).

The time devoted to the litigation includes all work on all matters involving the "common core of facts" or "based on related legal theories."  *Hensley*, 461 U.S. at 433, 435.  The Supreme Court recognized, "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis.  Such a lawsuit cannot be viewed as a series of discrete claims."  *Id.* at 435.  "Where a plaintiff has

8

obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified."  *Id.*  In *Mann v. United States,* 2014 WL 3501454, *6 (Fed. Cl. July 14, 2014), this Court noted, "[t]he first step in determining the amount of reasonable attorney's fees is to calculate the lodestar fee amount multiplying the number of hours spent on the litigation by a reasonable hourly rate…."

Turning to the second step, reasonable hourly rates, the Supreme Court directs, "[T]he critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate.  And the rates charged in private representations may afford relevant comparisons." *Blum v. Stenson*, 465 U.S. 886, 896, n.11 (1984).  In *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989), the Supreme Court declared, "we have consistently looked to the marketplace as our guide to what is 'reasonable.'"  The reasonable hourly rate is "calculated according to the prevailing market rates in the relevant community."  *Blum*, 465 U.S. at 895.  The hourly rates employed in the lodestar calculation should "adequately measure the attorney's true market value."  *Perdue*, 559 U.S. at 563.

The lodestar fee is *presumptive*.  "When…'the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee' to which counsel is entitled."  *Delaware Valley I*, 478 U.S. at 565 (quoting *Blum*, 465 U.S. at 897).  An adjustment to the lodestar calculation is "proper only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and

detailed findings by the lower courts." *Delaware Valley I*, 478 U.S. at 565; *see also Perdue*, 559 U.S. at 555.[18]

The trial court cannot adjust the lodestar fee by making mechanical across-the-board percentage cuts. In *Hensley*, the Supreme Court held "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." 461 U.S. at 435. When "*distinctly different* claims for relief…*based on different facts and legal theories*" are brought and fail, then the work on these matters may be excluded from the lodestar calculation. *Id.* at 434 (emphasis added). But, the Court continued, when the claim "involve[s] *a common core of facts or will be based upon related legal theories*. . . . [s]uch a lawsuit cannot be viewed as a series of discrete claims." *Id.* at 435 (emphasis added). In such a case, the plaintiff's attorney "should recover a fully compensatory fee." *Id.*

*City of Riverside v. Rivera*, 477 U.S. 561 (1986), illustrates this principle. In *Riverside* four plaintiffs sued thirty-two defendants alleging at least three different legal theories seeking money damages as well as injunctive and declaratory relief. Seventeen defendants were dismissed on summary judgment, and the plaintiffs prevailed against only five defendants with an award of only $33,000 and received no injunctive or declaratory relief. Given this limited success, Riverside and the Solicitor General said the fee should be limited to a proportion of the damages awarded and should not include work on the dismissed claims. The district court, however, awarded the full lodestar fee.

---

[18] In *Perdue* the Supreme Court identified four reasons to increase the lodestar fee: (1) "where the…hourly rate…does not adequately measure the attorney's true market value;" (2) "[if there is] an extraordinary outlay of expenses and the litigation is exceptionally protracted;" (3) where there is "exceptional delay in the payment of fees;" and, (4) "where an attorney assumes these costs in the face of unanticipated delay, particularly where the delay is unjustifiably caused by the defense." 559 U.S. at 554-56. Even though *all four* of these reasons for an upward adjustment of the lodestar fee exist here, we seek only an unadjusted lodestar fee.

The Supreme Court affirmed the trial court's decision to award the full lodestar fee noting, "all claims made by plaintiffs were based on a common core of facts.  The claims on which plaintiffs did not prevail were closely related to the claims on which they did prevail.  The time devoted to claims on which plaintiffs did not prevail cannot reasonably be separated from time devoted to claims on which plaintiffs did prevail."  477 U.S. at 583.  This Court rightly followed the Supreme Court's guidance in *Mann v. United States*:

> Indeed, it may be that where a plaintiff's claims arise from a common set of facts, the court may not be able to "divide the portion of fees spent on separate issues … for distinctly different claims."  In those situations, a "fee award is not reduced simply because the plaintiff failed to prevail on every contention raided in the lawsuit."

2014 WL 3501454, at *6.[19]

This is a much easier case that *Riverside*.  These three Florida landowners prevailed *entirely*.  Under the settlement reached with the government every one of these owners will, finally, be compensated.  These owners achieved a settlement in which the government agreed to compensate them for that property the government took and to pay interest from the date of taking until date of payment.  Thus, the Supreme Court directs, "where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee."  *Hensley* at 435.

The Supreme Court directs that any adjustment of the hours by the trial court must be based upon a comprehensive and careful analysis of the hours capable of "meaningful appellate review."  *See, e.g.*, *Blum*, 465 U.S. at 902, n.19.  *Blum* held blanket percentage cuts are incompatible with this command.  In *Interfaith Community Org. v. Honeywell Inter.*, 726 F.3d 403 (3rd Cir. 2013), the Third Circuit reversed the trial court for making across-the-board percentage cuts to the lodestar fee.  "The District Court reduced the fees in this category [of

---

[19] Quoting *Loomis v. United States*, 74 Fed. Cl. 350, 359 (2006), and *Hensley*, 461 U.S. at 435.

work] by 10% but gave no explanation as to why a 10% reduction was adequate." *Id.* at 417, n.10.  The Third Circuit held, "this perfunctory statement does not allow meaningful appellate review.…  '[W]here the opinion of the District Court 'is so terse, vague, or conclusory that we have no basis to review it, we must vacate the fee-award order and remand.…'"  *Id.* at 417 (citations omitted).  Similarly in *Bell v. United Princeton Prop. Inc.*, 884 F.2d 713, 720 (3rd Cir. 1989), the Third Circuit held a trial court may not *sua sponte* reduce a request for attorney fees. The party challenging a fee petition must produce affidavits or other specific evidence supporting its proposed reduction.  "The adverse party's submissions cannot merely allege in general terms that the time spent was excessive. …[Rather they] must identify the type of work being challenged … and must specifically state the adverse party's grounds for contending the hours … are unreasonable."  *Id.*

The Federal Circuit similarly reversed a trial court for making a blanket fifty percent cut to the lodestar fee.  *See Bywaters v. United States*, 670 F.3d 1221 (Fed. Cir. 2012); *rehearing denied*, 684 F.3d 1295 (Fed. Cir. 2012).  Two members of the Federal Circuit vacated the trial court's attorney fee award and remanded the case directing the trial court to justify its fifty percent cut in the lodestar fee.  670 F.3d at 1231.  Judge Plager dissented because the Supreme Court directed the trial court to award the unadjusted lodestar fee and, Judge Plager believed, a remand was unnecessary.  Rehearing was sought and the panel issued an "addition" to the opinion.  684 F.3d 1295 (Fed. Cir. 2012).  Judge Plager explained, "[t]he panel's addition to the opinion confirms my view that no remand is called for" in that the "trial judge expressly determined that under the circumstances of this case both the hours claimed and the attorneys' rate were reasonable. …"  *Id.* at 1297 (Plager, J., concurring-in-part and dissenting-in-part).

**II.     The hours devoted to this litigation by the owners' counsel are reasonable.**

"To demonstrate 'reasonable hours' worked, [Plaintiffs] should provide contemporaneous time records and a personal affidavit in support of the fee petition." *Lolley v. United States*, 18 Cl. Ct. 498, 507 (1989); *see also Hensley*, 461 U.S. at 433 (a "party seeking an award of fees should submit evidence supporting the hours worked and rates claimed").   Though the party seeking a fee is not required to account for every moment of counsel's time, counsel should "at least …identif[ied] the general subject matter of [their] time expenditures." *Design & Prod., Inc. v. United States*, 20 Cl. Ct. 207, 221 (1990) (citation omitted).   Owners' counsel devoted 1,761 hours to this litigation over the past seven and a half years and have provided detailed invoices itemizing the hours worked on this litigation.[20]

The *Hensley* Court noted that in cases such as this, where the attorneys and legal support personnel work on issues related to multiple claimants, "the district court should focus on the significance of the overall relief obtained by the plaintiffs in relation to the hours reasonably expended on the litigation."   461 U.S. at 435.   As plaintiffs, the owners were forced to pull the laboring oar bringing an inverse condemnation lawsuit against the federal government and proving their claims. *See Clarke, supra.*

Over the past seven and a half years, the owner's lead counsel, Thor Hearne, managed this litigation in the same manner he and Arent Fox manage complex federal litigation for private clients.[21]   This included assigning work to members of the litigation team with the lowest billing rate who had the appropriate experience to undertake the task.[22] Not only that, because the law firms undertook this representation on a contingency-fee basis in which the firms would only be

---

[20] Due to the confidential nature of such billing records, Exhibit 1 is being filed under seal.

[21] Exhibit 2 (Decl. of Hearne) para. 15-17.

[22] *Id.* para. 15.

paid upon a successful conclusion, both firms had a strong incentive to cost-efficiently manage the investment of time and expenses.[23]

Furthermore, the government's failure to concede its liability and the government's entrenched litigation strategy is the reason this litigation was costly and protracted.[24]

Given the number of owners, the time required to procure the necessary title documents and appraisals, and the government's tenacious litigation strategy, the hours devoted to this lawsuit are reasonable.

This work included conducting all of the research into historical land title records and the chain of title for each owner's property. We also researched the relevant Florida law and carried the burden of demonstrating the railroad held only an easement and that each owner held title to the fee estate when the Surface Transportation Board invoked §1247(d) of the Trails Act. We provided all this information to the government for their lawyers to review.

Given this, one expects the time owners' counsel devoted to this litigation to be substantially greater than whatever time the government lawyers spent defending the government. In other Trails Act litigation, we find the government lawyers spend as much, or more, time ultimately losing the case as owners' counsel spends with the case. *See, e.g.*, *Biery v. United States,* in which Justice Department lawyers spent 4,800 hours to lose a lawsuit when owners spent 3,900 to prevail. *Biery v. United States of America*, Case No. 16-316, 2016 WL 4772359 (U.S. Aug. 26, 2016) (petition for a writ of certiorari).

So, while we expect the government's lawyers to have spent less time opposing these owners than owners' counsel spent, we don't know how much time the government lawyers actually spent because the Justice Department is playing "hide-the-ball" with its time and

---

[23] *Id.* para. 15-16.

[24] *See Whispell*, 100 Fed.Cl. at 531-32 (describing procedural history).

expense records.  Why won't the Justice Department provide this information?  The Justice Department has (reluctantly) provided this information in other Trails Act litigation.[25]  What is the government trying to conceal?  Should the government refuse to provide the Justice Department's time and expense records, the government forfeits the ability to contest the reasonableness of the time landowners counsel devoted to this litigation.

**III.    The lodestar fee is calculated using "prevailing market rates" for which there is "specific proof."**

    **A.    To be "objective and reviewable" the lodestar fee must be calculated using market rates for which the trial court has "specific proof."**

Grounding the lodestar fee upon prevailing market rates arises directly from the reason Congress adopted fee-shifting statutes.  If the attorney fee is not based upon market-rates, the fee-shifting statute will fail its essential purpose of attracting capable counsel to accept civil rights cases.

The Supreme Court has established certain governing principles directing trial courts how to establish hourly rates.  In *Blum,* the Court noted the hourly rate must be one "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation," 465 U.S. at 896 n.11, and observed that, "the rates charged in private representations may afford relevant comparisons."  *Id.*  The Supreme Court "consistently look[s] to the marketplace as our guide to what is 'reasonable.'"  *Jenkins*, 491 U.S. at 285.  Most recently, in *Perdue*, the Court instructed, "the trial judge should adjust the attorney's hourly rate in accordance with *specific proof* linking the attorney's ability to a prevailing market rate."  559 U.S. at 555.[26]

---

[25] *See* Doc. No. 226 (motion to compel) at 3 citing *Campbell v. United States*, No. 13-324.

[26] Emphasis added.

"[T]he fee applicant [should] produce satisfactory evidence … the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.  A rate determined in this way is normally deemed to be reasonable, and is referred to – for convenience – as the prevailing market rate."  *Blum*, 465 U.S. at 896 n.11.  In *Jenkins*, 491 U.S. at 286, the Court held a reasonable attorney fee "is one calculated on the basis of rates and practices *prevailing in the relevant market* … and one that grants successful civil rights plaintiffs a 'fully compensatory fee'…comparable to what 'is traditional with attorneys compensated by a fee-paying client.'"[27]

The party seeking an attorney fee satisfies the presumption that the lodestar fee is proper when they provide that evidence the Supreme Court specified in *Blum*, *Jenkins*, and *Perdue*.  The burden then shifts to the opposing party (here, the government) to rebut the reasonableness of the fee.  "When…the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is *presumed* to be the reasonable fee.…" *Blum*, 465 U.S. at 897;[28] *see also Delaware Valley I*, 478 U.S. at 565.  Following the Supreme Court's admonition, the DC Circuit holds "Once the fee applicant has provided support for the requested rate, the burden falls on the Government to go forward with evidence that the rate is erroneous.  And, when the Government attempts to rebut the case for a requested rate, it must do so by equally specific countervailing evidence."  *Nat'l Assoc. of Concerned Veterans v. Sec'y of Defense*, 675 F.2d 1319, 1326 (D.C. Cir. 1982) (quoted and followed in *Covington v. Dist. of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995)).  *See also* the Third Circuit's decisions in *Bell* and *Interfaith*, *supra*.

---

[27] Emphasis added, citations omitted.

[28] Emphasis added.

The evidence we submit here in support of our hourly rates was considered sufficient by the DC Circuit.  "Plaintiffs submitted 'a great deal of evidence regarding prevailing market rates for complex federal litigation' … including the affidavit of the economist … Kavanaugh [the same economist whose affidavit supports these owners' fee application] explain[ing] why the LSI is a better measure of change in prices for legal services in Washington DC than the [Consumer Price Index ('CPI')-adjusted] update to the Matrix."  *Salazar v. District of Columbia*, 809 F.3d 58, 64 (D.C. Cir. 2015) (*Salazar V*).   This included billing-rate tables demonstrating the difference between the CPI-adjusted and LSI-adjusted *Laffey*-rates, and "*National Law Journal Rates Surveys* showing that rates for partners in Washington DC on the high-end of the market far exceeds the rates in the LSI update."  *Id.*  The Third Circuit requires the trial courts to have specific proof validating the use of the *Laffey*-rates.  *Interfaith*, 726 F.3d at 417 (remanding because district court's opinion was "terse, vague, or conclusory that we have no basis to review it").

One piece of evidence trial courts consider are attorney fee matrices like the *Laffey*-rates referenced above.  In *Eley* v. *District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015), the DC Circuit noted, "[W]e allow a fee applicant to submit attorney's fee matrices as one type of evidence."  But, the DC Circuit cautioned that "[f]ee matrices in general are 'somewhat crude' . . . [f]or this reason fee applicant [must] supplement fee matrices with other evidence such as 'surveys to update the[m]; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases. . . ."  *Id.* at 101.[29]

---

[29] The Supreme Court was similarly skeptical of relying solely upon the *Laffey*-matrix, which "does not adequately measure the attorney's true market value….  This may occur if the hourly rate is determined by a formula that takes into account only a single factor (such as years since admission to the bar) or perhaps only a few similar factors."  *Perdue*, 559 U.S. at 554-55.

The most common matrix for Washington DC is the *Laffey* matrix.  As discussed in footnote 11 above, the *Laffey*-rates are a schedule of hourly rates for legal services originally established in *Laffey v. Northwest Airlines*, 572 F. Supp. 354, 371 (D.D.C. 1983).[30]  The DC District Court, DC Circuit, and Third Circuit have adopted *Laffey*-rates as a "crude" guide and adjusted the rates for inflation.

*Laffey*-rates approximate prevailing market rates only if they are properly adjusted for inflation.  *Laffey*-rates have been adjusted for inflation in two ways.  The Justice Department formerly advocated adjusting *Laffey*-rates using the CPI, which measures the cost of consumer goods including "breakfast cereal, milk, coffee, chicken, wine . . . men's shirts and sweaters, women's dresses, jewelry [and] pet products" among other items such as haircuts and cigarettes.[31]  After a series of decisions, including the *Salazar* cases, rejecting this method, the Justice Department abandoned the CPI-adjusted *Laffey*-rates and adopted a new matrix.[32]

The Justice Department's new matrix is fundamentally flawed because it is not based on the actual *Laffey*-rates.  It is hard to claim you are using an adjusted *Laffey*-rate when you do not begin with the actual *Laffey*-rates.  Instead of beginning with the actual Laffey-rates, the Justice Department premises its calculation upon "the hourly rates … reported in 2011 survey data for

---

[30] *Aff'd in part, rev'd in part on other grounds*, *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C. Cir. 1984), *overruled in part on other grounds en banc in Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988).

[31] *See* Bureau of Labor Statistics website at:   <http://stats.bls.gov/cpi/cpifaq.htm#Question_7> (last visited September 26, 2016).

[32] *See* Exhibit 4 (Decl. of Dr. Kavanaugh) para. 18.  The Justice Department abandoned its advocacy of the CPI-Adjusted Laffey rates in 2015.  *See* <https://www.justice.gov/usao-dc/file/796471/download> (last visited September 26, 2016), at n. 2-4.   The Justice Department now adopts the Producer Price Index-Office of Lawyers.  Dr. Kavanaugh explained why the Justice Department's new method to adjust Laffey-rates is unsound.  Exhibit 4 (Decl. of Dr. Kavanaugh) para. 18-21.

the DC metropolitan area."[33]  The Justice Department does not tell us what "survey data" it used, so there is no way to know if these base rates are actually prevailing market rates for complex federal litigation in Washington DC or if the Justice Department's "survey" is based upon hourly rates attorneys in the greater Washington metropolitan area charge for other types of work – for example, what a solo-practitioner in Falls Church, Virginia charges to fix a traffic ticket or handle a no-fault divorce.

The second way to adjust the thirty-year-old *Laffey*-rates is by using the Legal Services Index.  This index, unlike the CPI, is specific to legal services.  The DC Circuit, Third Circuit and DC District Court find the LSI to be the "more reliable index for measuring legal hourly billing in the Washington DC area."  *See Salazar v. District of Columbia*, 991 F. Supp.2d 39, 47 (D.D.C. 2014).  The Federal Circuit likewise favorably cited the *Salazar*-adjusted *Laffey*-rates.  *See Bywaters v. United States*, 670 F.3d 1221, n.4 (Fed. Cir. 2012) ("The 'Updated *Laffey* Matrix' is a billing survey of District of Columbia market rates. The survey was conducted in 1988–1989 and has been recalculated in subsequent years using a methodology advocated by economist Dr. Michael Kavanaugh. The Updated *Laffey* Matrix has been used by the United States District Court for the District of Columbia to determine the amount of a reasonable attorney fee on several occasions.") (citing *Salazar*, 123 F. Supp. 2d at 15).[34]

---

[33]  *See* <https://www.justice.gov/usao-dc/file/796471/download> (last visited September 26, 2016), at n.2.

[34] The Federal Circuit broke with the DC Circuit and Third Circuit when, in *Biery,* it "declin[ed] to endorse either [the CPI- or LSI-adjusted *Laffey*-rates] for use in a lodestar calculation.  *Biery v. United States*, 818 F.3d 704, 714 (Fed. Cir. 2016).  *Biery* is now pending possible review by the Supreme Court on a petition for *writ of certiorari. Biery v. United States*, No. 16-316.

The Federal Circuit's "use-whatever-rate-you-want" approach is problematic guidance to trial courts.  It is impossible to have two "prevailing market rates" that are 38% different.  The (now abandoned) CPI-adjusted *Laffey*-rate method and the LSI-adjusted *Laffey*-rates cannot both be prevailing market rates for complex federal litigation in Washington, D.C.

The DC Circuit and Third Circuit have explicitly rejected the government's CPI-adjusted *Laffey*-rates in favor of LSI-adjusted *Laffey*-rates.  In *Salazar v. District of Columbia*, 809 F.3d 58 (D.C. Cir. 2015) (*Salazar V*), the DC Circuit "'confirmed the superior accuracy of the LSI/*Salazar* rates" and found "the *Salazar*/LSI Matrix represents *a conservative* estimate of the prevailing rates for legal services, at least for complex federal litigation in the District D.C. Circuit."  *Makray* v. *Perez*, 2016 WL 471271, *5 (D.D.C. Feb. 8, 2016) (citing *Salazar V*).  The DC Circuit held that, where the lawsuit involves complex federal litigation, "the only issue is whether [plaintiff] submitted sufficient evidence for the . . . court to conclude that the LSI *Laffey* Matrix applies."  *Salazar V*, 809 F.3d at 64.  The DC Circuit concluded, "The district court's selection of LSI *Laffey*-rates is consistent with this Court's intervening decision in *Eley*."  *Id.*

Following *Salazar V* and *Eley*, Chief District Judge Howell observed, "In light of the D.C. Circuit's recent observation that the *Salazar*/LSI Matrix represents *a conservative* estimate of the prevailing market rate for legal services in the District, this evidence demonstrates the plaintiff's requested rate is presumptively reasonable."   *Makray*, 2016 WL 471271, *17 (emphasis in original).  The Third Circuit similarly adopted the LSI-adjusted *Laffey*-rates for complex federal litigation in Washington DC,  "We thus affirm the District Court's use of the

---

The Federal Circuit's reference to these rates as a "starting point" for the trial court does not relieve the trial court of meeting the Supreme Court's requirement that the hourly rates used to calculate the lodestar fee must be based upon "specific proof" the hourly rates actually used are "in line with those prevailing in the community."  *Blum,* 465 U.S. at 896 n.11.  Thus, even if a court were to use the CPI-adjusted *Laffey*-rates or the Justice Department's new matrix as a "starting point," the trial court still must have "specific proof" demonstrating the hourly rates used to calculate the lodestar fee are equivalent to hourly rates private clients in the "relevant community" pay "for similar services by lawyers of reasonably comparable skill, experience and reputation."  *See Blum*, 465 U.S. at 896, n.11.

LSI-updated Laffey Matrix to determine the prevailing rates in the Washington D.C. market." *Interfaith*, 726 F.3d at 416.[35]

These Florida landowners submitted all that evidence the *Salazar* and *Interfaith* plaintiffs submitted, and more.  *See* pp. 5-7, *supra*.

### B.       The Supreme Court's decisions in *Jenkins* and *Perdue* direct this Court to calculate the lodestar fee using current rates.

This litigation began more than seven years ago and the government has not yet reimbursed these owners anything.  In *Perdue*, the Supreme Court held, "compensation for this delay [in payment of attorney fees] is generally made either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value."    559 U.S. at 556. The Supreme Court looks to the "practices prevailing in the relevant market place." *Jenkins*, 491 U.S. at 286.  The customary practice is for a private client to pay their legal fee within thirty-days after the work is performed.  *See* Exhibit 2 (Decl. of Hearne) para. 8; Exhibit 3 (Decl. of Munno) para. 6.  Lathrop and Gage, Arent Fox and other law firms establish their hourly rates with this expectation.

 The Federal Circuit held attorney fees should be calculated using historical hourly rates because "under the no-interest rule, recovery of interest on an award of attorney fees is barred unless an award of interest is expressly and unambiguously authorized by statute." *Biery v. United States*, 818 F.3d 704, 714 (Fed. Cir. 2016) (citing *Shaw v. Library of Congress*, 478 U.S.

---

[35] The Third Circuit is especially authoritative on fee-shifting jurisprudence because the Third Circuit pioneered the lodestar method.  *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 168 (3rd Cir. 1973), and *Report of the Third Circuit Task Force on Court Awarded Attorney Fees*, 108 F.R.D. 237 (1985).

310, 322 (1986)).  The Federal Circuit's broad reading of *Shaw* instructs trial courts to ignore the Supreme Court's subsequent decisions in *Jenkins* and *Perdue*.[36]

*Shaw* was a Title VII case in which the trial court awarded attorney fees, stayed final judgment three years to await the appellate court's decision on a related issue, and then made *a separate award* of pre-judgment interest of ten-percent per annum increasing the attorney fee award by thirty-percent.  The government argued the "no-interest-rule" prohibited the trial court from making a separate award of pre-judgment interest against the United States.  The Supreme Court agreed.  *Shaw*, 478 U.S. at 311.

*Shaw* did not, however, involve an award of attorney fees calculated at current, as opposed to historical, hourly rates.  *Shaw* cannot be extrapolated to forbid calculating a "reasonable attorney fee" using market rates in effect when the fee is paid.  Using current hourly rates to determine a reasonable attorney fee is not a *separate award* of pre-judgment interest.

Furthermore, even if one believed using current hourly rates is an award of "pre-judgment interest" as, as opposed to an award of a "reasonable attorney," Congress waived sovereign immunity when it said this court "*shall*" award a "*reasonable attorney fee*."  The Supreme Court holds, a "*reasonable attorney fee*" is based upon current hourly rates given "practices prevailing in the relevant market place."  *Jenkins*, 491 U.S. at 286.  Private clients do not pay their attorneys a fee in 2016 using historical rates from a half-decade earlier.[37]

---

[36] We acknowledge this Court is bound by the Federal Circuit's decisions.  To the extent this Court reads *Biery* to preclude calculating the lodestar fee using current hourly rates, the Federal Circuit's holding is contrary to the Supreme Court's holdings.  Should this Court adopt this view, we preserve this issue for review by the Federal Circuit *en banc* or by the Supreme Court.

[37] There is no evidence (and the government cannot produce any) that the "prevailing practice" in the legal services market is for private fee-paying clients to pay their attorneys an hourly fee using rates from years or decades earlier.  *See* Exhibit 2 and Exhibit 3.

In *Newport News Shipbuilding & Dry Dock v. Holiday*, 591 F.3d 219, 228 (4th Cir. 2009), the Fourth Circuit explained:

> [The tribunal] took a ten-year old hourly rate, assumed it was a reasonable basis for an hourly rate today, and adjusted it upwards by the arbitrary amount of $50. This is an abuse of discretion. …[A]n hourly rate appropriate ten years ago, arbitrarily adjusted with no regard to the facts of the case or the lodestar factors, is not necessarily appropriate today.[38]

The Supreme Court's decision in *Perdue* and *Jenkins* explicitly cabined *Shaw*. In *Jenkins*, the Supreme Court explained, "*Shaw* thus does not represent a general-purpose definition of compensation for delay that governs here. Outside the context of the 'no-interest rule' of federal immunity, we see no reason why compensation for delay cannot be included within §1988 attorney's fee awards.… " *Jenkins*, 491 U.S. at 282 n.3.

C. **Unless this Court reimburses these owners' unadjusted lodestar fee the policy for which Congress adopted the URA will be frustrated.**

*"First thing we do, let's kill all the lawyers."* HENRY VI, Part 2, Act 4, Scene 2. Justice Stevens explained, "the independent lawyer [is] a guardian of our freedom." Justice Stevens then explained this line from HENRY VI is not a disparagement of lawyers but the opposite: "[The line] was spoken by a rebel, not a friend of liberty. …Shakespeare insightfully realized that disposing of lawyers is a step in the direction of a totalitarian form of government." *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 335, 371, n.24 (1985).

Congress adopted fee-shifting statutes to "ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley*, 461 U.S. at 429. The URA, like other civil rights fee-shifting statutes, was adopted because "if the citizen does not have the resources, his

---

[38] Citing *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978); and *Christensen v. Stevedoring Servs. of Am.*, 557 F.3d 1049, 1054-55 (9th Cir.2009) (The [tribunal] must "make … determinations [of the relevant community and the reasonable hourly rate] with sufficient frequency that it can be confident—and we can be confident in reviewing its decisions – that its fee awards are based on current rather than merely historical market conditions.").

day in court is denied him; the congressional policy he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers." *Riverside*, 477 U.S. at 575.   The Supreme Court "reject[ed] the notion that a civil rights action for damages constitutes nothing more than a private tort suit benefitting only the individual plaintiffs whose rights were violated. …[these cases] vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *Id.* at 574.

The "important public purpose" of a fee-shifting statute is to "[make] it possible for persons without means to bring suit to vindicate their rights." *Perdue*, 559 U.S. at 559.   To realize this purpose, "an attorney is [to be] compensated at the rate that the attorney would receive in cases not governed by the federal fee-shifting statutes." *Id.* at 555.

The URA was adopted "to establish a uniform policy for the fair and equitable treatment of [land] owners … to the end that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole." *Alexander v. United States Dept. of Housing & Urban Dev.*, 441 U.S. 39, 51 (1979) (quoting "Declaration of Policy," S.1, 91st Cong., 1st Sess., §201 (1969)).[39]

Senator Muskie, a chief sponsor of the URA, explained the fee-shifting provision was adopted to "'assure that the person whose property is taken is no worse off economically than before the property was taken.'"   *Id.* (quoting 115 Cong. Rec. 31533 (Oct. 27, 1969)).   Senator Richard Burr reaffirmed the importance of this policy during an April 2008 hearing, where he

---

[39] The government could have avoided all this *Strum und Drang* and the attendant expense. "The Government could, of course, have taken appropriate proceedings, to condemn as early as it chose, both land and … easements.   The Government chose not to do so. …thereby putting on the owner the onus of determining the [taking and the burden and expense of 'tak[ing] affirmative action to recover just compensation.']"   *United States v. Dickinson,* 331 U.S. 745, 747-48 (1947); *see also Clarke*, *supra.*

rebuked the Justice Department for its use of the statute of limitations as a "gotcha game" to deny deserving citizens their right to compensation.[40]

The Solicitor General recently observed:

The unique litigation-expense provisions in the [the URA] reflect Congress's intent to make takings plaintiffs whole by requiring the government to cover the reasonable expenses that successful plaintiffs incur in inverse-condemnation actions…. And while most fee-shifting provisions make awards discretionary … [the URA] is phrased in mandatory terms, requiring that courts … "*shall* determine and award" a sum to "reimburse [the takings] plaintiff" for his reasonable litigation expenses.[41]

The DC Circuit holds that "fees should be neither lower, nor calculated differently, when the losing defendant is the government." *Salazar V*, 809 F.3d at 65 (quoting *Copeland v. Marshall*, 641 F.2d 880, 896 (D.C. Cir.1980) (*en banc*)).

Let's be clear, the bad actor in this lawsuit is the federal government.  Federal bureaucrats issued an order taking these Florida owners' land in violation of the Fifth

---

[40] Senator Burr said:

Mr. Chairman, my last statement is not a question, but it is a statement….  I hope you would take back to the individuals at the Justice Department that made this determination, that I take very seriously of takings. [*sic*]   I think that when somebody's land is taken there has to be compensation for that.  I'm not an expert on what statute of limitations we've got currently or what triggers the clock starting.

I have always found regardless of what I look at, the Federal Government's clock usually starts well before people on the other side.  It's only because we get to interpret.  They have to guess.

I truly believe that we have people that were engaged in what they thought was an honest negotiation.  If for some reason we found a technical reason to run the clock out and now the position of the Justice [Department] is oops, so sorry.  You missed out on compensation.  That's not the American way.

So, you might send a message to the Justice Department.  I would advise finding a way to settle this.  If not legislatively, we will accommodate the needs of those property owners that have not been compensated.

*See* Miscellaneous National Parks Legislation: Hearing Before the Subcomm. on National Parks of the S. Comm. on Energy and Natural Resources, 110th Cong. 29 (2008) (statement of Sen. Richard Burr, Member, Subcomm. on National Parks).

[41] *See* footnote 10 *supra*. at p. 4.

Amendment.  There is no dispute on this point.  Yet the Justice Department mounted a spirited challenge to the compensation each owner was due.  In the end the owners prevailed and the government settled its obligation.  Congress adopted fee-shifting statutes to "ensure that federal rights are adequately enforced."  *Perdue*, 559 U.S. at 550, 552 (citing *Delaware Valley I*, 478 U.S. at 565).  Congress directed this Court to order the government to pay these owners attorney fees and reimburse their out-of-pocket litigation expenses.

## CONCLUSION

The Supreme Court wisely observed that a "request for attorney's fee should not result in a second major litigation. Nor should it lead to years of protracted appellate review."  *Perdue*, 559 U.S. at 1684 (Kennedy, J. dissenting) (citing *Hensley*, 461 U.S. at 437).  *See similarly*, Justice Brennan's concurrence (joined by Justices Marshall, Blackmun and Stevens) finding that when the government disputes attorney fees after losing on the merits it "must be one of the least socially productive types of litigation imaginable."  *Hensley*, 461 U.S. at 442.

The Supreme Court wants to avoid attorney fees being a wasteful additional round of litigation.  Toward that end the Supreme Court adopted the lodestar fee as a presumptive "reasonable attorney fee" directing that the lodestar fee should only be adjusted in "rare" and "exceptional" circumstances and, should a trial court adjust the lodestar fee, the trial court must base its adjustment upon "specific proof" capable of "meaningful appellate review."

Accordingly, we ask this Court to order the government to reimburse these owners their unadjusted lodestar attorney fee of $998,402 and out-of-pocket litigation costs of $10,860.  And, to the extent these attorney fees and costs have increased since August, to reimburse these owners' additional fees and expenses.

Date: October 11, 2016                    Respectfully submitted,

                                          **ARENT FOX, LLP**

                                          _/s/ Mark F. (Thor) Hearne, II_
                                          MARK F. (THOR) HEARNE, II
                                          Lindsay S.C. Brinton
                                          Meghan S. Largent
                                          1717 K Street, NW
                                          Washington, D.C. 20006

                                          112 S. Hanley Road, Suite 200
                                          Clayton, MO 63105
                                          Tel:  (314) 296-4000
                                          Fax:  (202) 857-6395
                                          thornet@ix.netcom.com
                                          lindsay.brinton@arentfox.com

                                          _Counsel for Landowners_

27