IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WHISPELLS FOREIGN CARS, INC., *et al.*,  )
                                                      )
      Plaintiffs,  )
                                                     )    Chief Judge Patricia E.
                                                   )    Campbell-Smith
v.  )
                                                   )    No. 09-315 L
UNITED STATES OF AMERICA,  )
                                                   )
      Defendant.  )

## LANDOWNERS  REPLY IN SUPPORT OF THEIR MOTION FOR ATTORNEY FEES AND LITIGATION EXPENSES

**ARENT FOX LLP**

Mark F. (Thor) Hearne, II
Lindsay S.C. Brinton
Meghan S. Largent
Stephen S. Davis
Abram J. Pafford
Arent Fox, LLP
1717 K Street, NW
Washington, D.C. 20036
Tel:  (202) 857-6000
Fax:  (202) 857-6395
Thor@arentfox.com

112 S. Hanley Road, Suite 200
Clayton, MO 63105
(314) 296-4000

*Counsel for Landowners*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.  The unadjusted lodestar fee is a reasonable attorney fee ................................. 2

A.  The government s proposed percentage cuts to the lodestar fee violate controlling precedent ........................................................... 3

B.  The work these owners  counsel devoted to this litigation was reasonable and necessary ............................................................... 6

II.  The Forum Rate Presumption governs the hourly rates used to calculate the lodestar fee ........................................................................................ 7

A.  The lodestar fee is calculated using hourly rates private clients pay lawyers of comparable skill and experience to represent them in this forum ............................................................................................. 7

B.  The *Davis County* exception to the Forum Rate Presumption does not apply ....................................................................................... 9

1.  Private clients in St. Louis do not pay lawyers of comparable experience seventy percent less than private clients pay comparable lawyers in Washington DC to represent them in comparable litigation 9

2.  The government cannot demonstrate all the work was performed in a low-rate forum where clients pay comparable lawyers seventy-percent less than in Washington DC ................................................. 11

C.  The hourly rates used to calculate the unadjusted lodestar fee are consistent with rates prevailing in this forum ............................... 12

D.  The lodestar fee must be calculated using current hourly rates .................... 15

III.  The federal government is responsible for the cost of this litigation ......................... 18

CONCLUSION ....................................................................................................................... 20

## TABLE OF EXHIBITS

Exhibit 1 ...................................................... Plaintiffs  additional fees and expenses

Exhibit 2 ...................................................... Hearing transcript in *Campbell v. United States*, No. 13-324L (March 17, 2017)

Exhibit 3 ...................................................... Summary of government s time and expenses

Exhibit 4 ...................................................... Supplemental declaration of Mark F. (Thor) Hearne, II

Exhibit 5 ...................................................... Table comparing government s proposed rates for St. Louis and Washington DC

Exhibit 6 ...................................................... Declaration of Catherine L. Hanaway

Exhibit 7 ...................................................... Table comparing government s proposed rates in other cases

Exhibit 8 ...................................................... DOJ locality pay table

Exhibit 9 ...................................................... Declaration of Hugh Culverhouse

Exhibit 10 .................................................... Rate comparison table of Arent Fox timekeepers

Exhibit 11 .................................................... U.S. Attorney s Office new attorney fee matrix

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. United States Dept. of Housing & Urban Dev.,*
   441 U.S. 39 (1979) ............................................................................................ 22

*Bell v. United Princeton Prop. Inc.,*
   884 F.2d 713 (3rd Cir. 1989) ............................................................................... 6

*Blum v. Stenson,*
   465 U.S. 886 ....................................................................................... 3, 5, 9, 12

*Boyer v. United States,*
   No. 14-33 ........................................................................................................ 13

*Brady v. Maryland,*
   373 U.S. 83 (1963) ............................................................................................ 20

*Bywaters v. United States,*
   670 F.3d 1226 (Fed. Cir. 2012), *reh g denied with add n,* 684 F.3d 1295 (Fed. Cir.
   2012) ............................................................................................. 3, 9, 11, 16, 17

*Campbell v. United States,*
   No. 13-324 ....................................................................................................... 13

*Campbell v. United States,*
   No. 13-324L ....................................................................................................... 7

*Childers v. United States,*
   116 Fed. Cl. 486 (2014) ..................................................................................... 10

*Christiansburg Garment Co. v. EEOC,*
   434 U.S. 412 (1978) .......................................................................................... 20

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.,*
   526 U.S. 687 (1999) ...................................................................................... 1, 20

*City of Riverside v. Rivera,*
   477 U.S. 561 (1986) ............................................................................................ 5

*Davis County Solid Waste Management & Energy Recovery Special Service District v. United
   States Environmental Protection Agency,*
   169 F.3d 755 (DC Cir. 1999) ...................................................................... *passim*

*Design & Prod. Inc. v. United States,*
   20 Cl. Ct. 207 (1990) ...................................................................................................2

*Eley v. District of Columbia,*
   793 F.3d 97 (DC Cir. 2015) ................................................................................... 15, 16

*Eley v. District of Columbia,*
   999 F. Supp.2d 137 (D.D.C. 2013), *vacated on other grounds, Eley v. District of
   Columbia,* 793 F.3d 97 (DC Cir. 2015) ...........................................................9, 10, 17

*Fox v. Vice,*
   563 U.S. 826 (2011) .................................................................................................. 2, 4

*Garrison v. Sec'y of Health & Human Servs.,*
   128 Fed. Cl. 99 (2016) ............................................................................................... 11

*Haggart v. Woodley,*
   No. 15-1072........................................................................................................... 20

*Hash v. United States,*
   2012 WL 1252624 (D. Idaho 2012) ....................................................................3, 6, 8

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983) ............................................................................................. 2, 4, 5

*Hernandez v. Chipotle Mexican Grill, Inc.,*
   2017 WL 2804867 (D.D.C. 2017) .............................................................................. 17

*Interfaith Community Org. v. Honeywell Inter.,*
   726 F.3d 403 (3rd Cir. 2013) .............................................................................. *passim*

*Laffey v. Northwest Airlines,*
   572 F. Supp. 354 (D.D.C. 1983), *Aff'd in part, rev'd in part on other grounds, Laffey v.
   Northwest Airlines, Inc.,* 746 F.2d 4 (DC Cir. 1984), *overruled in part on other grounds en
   banc in Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516 (DC Cir. 1988)...........16, 17, 18

*Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,*
   487 F.2d 161 (3rd Cir. 1973) ..................................................................................... 18

*Lolly v. United States,*
   18 Ct. Cl. 498 (1987) ...................................................................................................2

*Makray v. Perez,*
   2016 WL 471271 (D.D.C. Feb. 8, 2016) ..................................................................... 17

*Masias v. Sec'y of Health & Human Servs.,*
   634 F.3d 1283 (Fed. Cir. 2011) .................................................................................. 11

-iv-

*McCann Holdings, Ltd. v. United States,*
    111 Fed. Cl. 608 (2013) ................................................................................... 10

*McCarty v. United States,*
    No. 14-316 ........................................................................................................ 13

*Missouri v. Jenkins,*
    491 U.S. 274 (1989) ...................................................................................... 3, 12

*Nadarajah v. Holder,*
    569 F.3d 906 (9th Cir. 2009) ............................................................................. 8

*Palmer Ranch Holdings, Ltd. v. Comm. of IRS,*
    812 F.3d 982 (11th Cir. 2016) ......................................................................... 10

*Pennsylvania v. Delaware Valley Citizen Counsel for Clean Air,*
    478 U.S. 546 (1986) (*Delaware Valley I*) .......................................................... 2

*Perdue v. Kenny A., ex. rel. Winn,*
    559 U.S. 542 (2010) ................................................................................ *passim*

*Preseault v. Interstate Commerce Commission,*
    494 U.S. 1 (1990), (*Preseault I*) ..................................................................... 19

*Preseault v. United States,*
    100 F.3d 1525 (Fed. Cir. 1996) (*Preseault II*) ............................................... 19

*Salazar v. District of Columbia,*
    123 F. Supp.2d 8 (D.D.C. 2000) (*Salazar I*) ................................................. 16

*Salazar v. District of Columbia,*
    30 F. Supp.3d 47 (D.D.C. 2014) (*Salazar IV*) ............................................... 16

*Salazar v. District of Columbia,*
    809 F.3d 58 (DC Cir. 2015) (*Salazar V*) .................................................. *passim*

*Salazar v. District of Columbia,*
    991 F. Supp.2d 39 (D.D.C. 2014) (*Salazar III*) ....................................... 16, 17

*Shaw v. Library of Congress,*
    478 U.S. 310 (1986) ........................................................................................ 19

*SUFI Network Services, Inc. v. United States,*
    128 Fed. Cl. 683 (2016) .................................................................................. 19

*Textainer Equipment Management Ltd. v. United States,*
    2017 WL 1477148 (Fed. Cl. April 25, 2017) ........................................ 5, 17, 18

*United States v. Clarke*,
   445 U.S. 253 (1980) ........................................................................................................1

*United States v. Dickinson*,
   331 U.S. 745 (1947) ........................................................................................................1

*Whispell v. United States*,
   100 Fed. Cl. 529 (Aug. 29, 2011) ....................................................................................1

**Statutes**

42 U.S.C. §4654(c) ..............................................................................................................1

Trails Act ..................................................................................................................... *passim*

AFDOCS/15411575.1

## INTRODUCTION

In 2004, the federal government violated the Fifth Amendment and took these Florida landowners property. To vindicate their constitutional right to be justly compensated these owners were forced to bring this inverse condemnation action. Owners forced to bring an inverse condemnation lawsuit are placed at a significant disadvantage and must bear the burden to take affirmative action to recover just compensation. *United States v. Clarke*, 445 U.S. 253, 257 (1980). See also *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 711-12 (1999), and *United States v. Dickinson*, 331 U.S. 745, 747-48 (1947). These owners endured almost a decade of litigation to prevail. This Court ultimately found the government liable for taking their property and this Court ordered the government to justly compensate these owners, with interest. *Whispell v. United States*, 100 Fed. Cl. 529 (Aug. 29, 2011). Vindicating their constitutional right to be justly compensated caused these owners to incur more than $1.1 million in attorney fees and litigation expenses.

When the government takes an owner s property in violation of the Fifth Amendment, the government must fully reimburse the owner s legal fees and litigation expenses. Section 4654(c) of the URA, 42 U.S.C. 4654(c), says this Court *shall* award owners a reasonable attorney fee and reimburse these owners litigation expenses. The landowners substantiated the $1.1 million lodestar fee and litigation expenses they incurred with detailed time records, declarations of counsel and experts, and surveys demonstrating the fee was reasonable and appropriate.

The government provides nothing in response. This Court should follow the Supreme Court s and the Circuit Court s controlling precedent and order the government to reimburse these owners $1,118,299 as the unadjusted lodestar attorney fee and $14,362 in out-of-pocket litigation costs.[1]

---

[1] **Exhibit 1** (detailed description of landowners additional fees and expenses).

**ARGUMENT**

I.   **The unadjusted lodestar fee is a reasonable attorney fee.**

The Supreme Court presumes the lodestar fee is a reasonable attorney fee. See *Perdue v. Kenny A., ex. rel. Winn*, 559 U.S. 542, 552 (2010) ( We have said that the [lodestar] presumption is a strong one. ) (citing *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992), and *Pennsylvania v. Delaware Valley Citizen Counsel for Clean Air*, 478 U.S. 546, 565 (1986) (*Delaware Valley I*). The lodestar fee is the product of the hours devoted to the litigation multiplied by a reasonable hourly rate. The prevailing party should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended in the litigation, and indeed in some cases of exception success and enhanced award may be justified. *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). A court should compensate the plaintiff for the time his attorney reasonably spent in achieving the favorable outcome, even if the plaintiff failed to prevail on every contention. *Fox v. Vice*, 563 U.S. 826, 834 (2011).

A party seeking an award of fees should submit evidence supporting the hours worked and the rates claimed. *Hensley*, 461 U.S. at 433. See also *Lolly v. United States*, 18 Ct. Cl. 498, 507 (1987) ( To demonstrate reasonable hours worked, [Plaintiffs] should provide contemporaneous time records and a personal affidavit in support of the fee petition. ), and *Design & Prod. Inc. v. United States*, 20 Cl. Ct. 207, 221 (1990) (the party seeking fees is not required to account for every moment of counsel s time so long as the proponent has at least identif[ied] the general subject matter of [their] time expenditures. ) (citations omitted).

The lodestar fee must be calculated using rates private clients in the community pay lawyers with comparable skill, experience and resources. *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989) ( we have consistently looked to the marketplace as our guide to what is reasonable. ) See also *Blum v. Stenson*, 465 U.S. 886, 895 and 896, n.11 (1984), and *Perdue*, 559 U.S. at 563. The Circuits apply the Forum Rate Presumption which holds reasonable rates are those prevailing in the forum where the

Court sits.  See, *e.g.*, *Salazar v. District of Columbia*, 809 F.3d 58 (DC Cir. 2015) (*Salazar V*), *Interfaith Community Org. v. Honeywell Inter.*, 726 F.3d 403 (3rd. 2013), and *Bywaters v. United States*, 670 F.3d 1226 (Fed. Cir. 2012), *reh g denied with add n*, 684 F.3d 1295 (Fed. Cir. 2012).[2]

The government agrees the lodestar fee is presumptively a   reasonable attorney fee   under federal fee-shifting statutes.  See Gov t. Br. at 12 ( Plaintiffs correctly note that  the lodestar method is the presumptive standard  for determining reasonable attorneys fees. ).  But the government then asks this Court to adjust (reduce) the presumptively reasonable lodestar fee by making a series of arbitrary, mechanical percentage cuts of up to eighty-percent.  *Id.* at 15-24.

## A.  The government s proposed percentage cuts to the lodestar fee violate controlling precedent.

The government arbitrarily divides this litigation into four stages and then proposes a series of equally arbitrary percentage cuts to the work these owners  lawyers devoted to each phase.  See Gov t Br., pp. 15-19.  What the government asks this Court to do is *exactly* what the Supreme Court said this Court must *not* do.  The Supreme Court says this Court must *not* divide the litigation into discrete  phases,  and the Supreme Court and the circuit courts forbid arbitrary percentage cuts to the lodestar fee.

---

[2] There are only two exceptions to the Forum Rate Presumption.  The first exception allows out-of-forum rates when the proponent demonstrates no lawyers in the forum possess the skill or experience to represent the client.  See *Bywaters v. United States*, 670 F.3d 1221, n.9 (Fed. Cir. 2012), *reh g denied*, 684 F.3d 1295 (Fed. Cir. 2012).  See also *Hash v. United States*, 2012 WL 1252624, at *5 (D. Idaho 2012) ( Virtually all circuits follow the general rule that forum rates apply absent unusual circumstances. ).  The second exception to the Forum Rate Presumption is the *Davis County* exception described in the eponymic decision, *Davis County Solid Waste Management & Energy Recovery Special Service District v. United States Environmental Protection Agency*, 169 F.3d 755 (DC Cir. 1999).  The party seeking an exception to the Forum Rate Presumption must justify the exception by demonstrating that *both* the prevailing hourly rates in the out-of-forum community are more than seventy-percent less than the prevailing hourly rates in the forum *and* that all (or substantially all) of the work was actually performed in the low-rate out-of-forum community.  Neither is so here.

A reasonable attorney fee must include payment for all hours devoted to the litigation including all work on all matters involving the common core of facts or based on related legal theories. *Hensley*, 461 U.S. at 433, 435. The Supreme Court recognized, [m]uch of counsel s time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. *Id.* at 435 (emphasis added). The Supreme Court continued, Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass *all hours* reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. *Id.* at 435 (emphasis added).

In *Fox*, 563 U.S. at 833-34, the Court explained:

> [I]n the real world, [unlike Hollywood movies] litigation is more complex, involving multiple claims for relief that implicate a mix of legal theories and have different merits. Some claims succeed; others fail . In short, litigation is messy, and courts must deal with this untidiness in awarding fees. [W]e have made clear that plaintiffs may receive fees even if they are not victorious on every claim. A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress s statutory purposes. That result is what matters, we explained in *Hensley*, 461 U.S. at 435. A court should compensate the plaintiff for the time his attorney reasonably spent in achieving the favorable outcome, even if the plaintiff failed to prevail on every contention. *Ibid.*

Furthermore, neither the government nor the trial court can reduce the lodestar fee by making mechanical percentage cuts. In *Textainer Equipment Management Ltd. v. United States*, 2017 WL 1477148, *4 (Fed. Cl. April 25, 2017), this Court noted, The court is mindful that in reducing fees the court should not engage in a mechanical exercise and thus rejects a straight percentage reduction. In *Hensley* the Supreme Court held the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. 461 U.S. at 435. The Court continued, when the claim involve[s] a common core of facts or will be based upon related legal

theories .[s]uch a lawsuit cannot be viewed as a series of discrete claims. *Id.* at 435 (emphasis added). In such a case, the plaintiff s attorney should recover a fully compensatory fee. *Id.*[3]

The Supreme Court also directs that any adjustment of the hours upon which the lodestar fee is calculated *must* be based upon a comprehensive and careful analysis capable of meaningful appellate review. See, *e.g.*, *Blum*, 465 U.S. at 902, n.19. *Blum* held blanket percentage cuts are incompatible with this command. In *Interfaith Community Org. v. Honeywell Inter.*, 726 F.3d 403, 417, n.10 (3rd Cir. 2013) (following the Supreme Court s direction), the Third Circuit reversed the trial court for making across-the-board percentage cuts to the lodestar fee. The District Court reduced the fees in this category [of work] by 10% but gave no explanation as to why a 10% reduction was adequate. The Third Circuit held, this perfunctory statement does not allow meaningful appellate review. [W]here the opinion of the District Court is so terse, vague, or conclusory that we have no basis to review it, we must vacate the fee-award order and remand. *Id.* at 417 (citations omitted). Similarly in *Bell v. United Princeton Prop. Inc.*, 884 F.2d 713, 720 (3rd Cir. 1989), the Third Circuit held a trial court may not *sua sponte* reduce a request for attorney fees.

The party challenging a fee petition (here the government) must produce affidavits or other specific evidence supporting its proposed reduction. The adverse party s submissions cannot merely allege in general terms that the time spent was excessive. [Rather they] must identify the type of

---

[3] *City of Riverside v. Rivera*, 477 U.S. 561 (1986), illustrates this principle. In *Riverside* four plaintiffs sued thirty-two defendants alleging at least three different legal theories seeking money damages as well as injunctive and declaratory relief. Seventeen defendants were dismissed on summary judgment, and the plaintiffs prevailed against only five defendants with an award of only $33,000 and received no injunctive or declaratory relief. Given this limited success, Riverside and the Solicitor General said the fee should be limited to a proportion of the damages awarded and should not include work on the dismissed claims. The district court, however, awarded the full lodestar fee. The Supreme Court affirmed the district court s decision awarding the full lodestar fee noting all claims made by plaintiffs were based on a common core of facts. The claims on which plaintiffs did not prevail were closely related to the claims on which they did prevail. The time devoted to claims on which plaintiffs did not prevail cannot reasonably be separated from time devoted to claims on which plaintiffs did prevail. *City of Riverside*, 477 U.S. at 583.

work being challenged     and must specifically state the adverse party s grounds for contending the hours     are unreasonable.   *Id.* See also *Hash v. United States*, 2012 WL 1252624, at *5 (D. Idaho 2012).

For this Court to do what the government asks (make a series of arbitrary percentage reductions to the unadjusted lodestar fee of up to eighty percent) would be reversible error because it is directly contrary to the Supreme Court s and the Circuit Courts  jurisprudence.

**B.     The work these owners  counsel devoted to this litigation was reasonable and necessary.**

Judge Wolski recently explained the Trails Act scheme is   basically enlisting private property owners and enlisting private lawyers as kind of like private attorney[s] general who will actually have to go out and figure out, okay, who are the people that should be compensated and who aren t. Exhibit 2 (*Campbell v. United States*, No. 13-324L, Argument Tr. (March 17, 2017)), pp. 80-81.[4]

Nineteen government lawyers and other Justice Department personnel spent more than 1,200 hours over the past decade opposing these Florida owners  right to be justly compensated. See Exhibit 3.[5]   During this same time, the landowners  counsel and paralegals spent only about 1,800 hours vindicating these owners  right to be compensated.

---

[4] Judge Wolski noted that work on  even unsuccessful claims  was necessary to prevail on the successful claims because  the whole process of working through [title research] for a whole corridor is important to any of the property owners who ultimately prevail because unless somebody had undertaken that process for everyone, they wouldn t have undertaken it individually for anyone.   *Id.* at 81.  Thus,  in other words, because [trail conversion] was chosen by the Government to be accomplished by means other than direct condemnation, a lot of the sort of research costs by lawyers on behalf of unsuccessful claimants really is part of determining how successful claimants should be compensated.   *Id.*

[5] The Justice Department only responded to the owners  FOIA request for time through August 2016. Government lawyers have spent more time since then.  Exhibit 3 is a table of the time the government lawyers spent on this litigation.  But this is only time through August 2016.  The government provided this summary in response to the landowners  FOIA request.  The landowners have requested the government to supplement this information, but the government has not yet complied with this request.

Through August 2017 these owners' counsel devoted more than 1,946 hours to this litigation and incurred more than $1,118,299 in attorney fees and $14,362 in costs and litigation expenses. Let's call it $1,120,000 in attorney fees and $15,000 in litigation expenses.

That time the owners' counsel devoted to this litigation was reasonable, appropriate, and necessary. Furthermore, because Arent Fox represented these owners on a contingency-fee basis, Arent Fox had a powerful incentive to minimize the investment of time and manage the litigation in as cost-efficient a manner as possible. *Id.*

> Lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker.

> *Moreno v. City of Sacramento*,
> 534 F.3d 1106, 1112 (9th Cir. 2008).[6]

The 1,947 hours of work these owners' counsel spent over almost a decade to research a century of land title documents, appraise each owner's property, and conduct the attendant briefing and research required to establish the government's liability and that compensation due each owner is *extremely* reasonable. The government provides *nothing* to refute this conclusion.

## II.   The Forum Rate Presumption governs the hourly rates used to calculate the lodestar fee.

### A.   The lodestar fee is calculated using hourly rates private clients pay lawyers of comparable skill and experience to represent them in this forum.

The Federal Circuit, as well as the DC Circuit and Third Circuit, adopted the Forum Rate Presumption holding a reasonable attorney fee is calculated using the hourly rates prevailing in the

---

[6] This finding was affirmed, quoted and followed by the Ninth Circuit in *Nadarajah v. Holder*, 569 F.3d 906, 924 (9th Cir. 2009) and in the Trails Act case, *Hash v. United States*, 2012 WL 1252624 (D. Idaho, April 13, 2013).

forum.  See *Bywaters*, 670 F.3d at 1232; *Salazar v. Dist. of Columbia*, 809 F.3d 58 (DC Cir. 2015), and *Interfaith*, 726 F.3d at 413.  See also *Blum v. Stenson*, 465 U.S. at 895.

The fact the government is the party that must reimburse these owners  legal fees does not justify reducing the lodestar fee or the rates.   Supreme Court and D.C. Circuit precedent is clear that such concerns are not legally cognizable reasons for reducing an attorney s fee award in civil rights litigation.   *Eley v. District of Columbia*, 999 F. Supp.2d 137, 156 (D.D.C. 2013) (*Eley I*), *vacated on other grounds*, *Eley v. District of Columbia*, 793 F.3d 97, 103, 417 (DC Cir. 2015).

The government asks this Court to calculate the lodestar fee using supposed  hometown  or  lawyer-locality  rates.  But, in *Avera v. Sec y of Health & Human Servs.*, the Federal Circuit *explicitly* rejected the government s  lawyer-locality  or  hometown-rate rule.   515 F.3d 1343, 1348-49 (Fed. Cir. 2008).   The government urges that we adopt a  hometown rule  which dictates that the proper rate to apply is the market rate of the geographic location where the attorney maintains an office and practices law.  Under the hometown rule approach, a court need only consider the geographic location where the attorney is based     We disagree.     [T]here is no reason to depart from the general rule that a court should apply the forum rate to determine the amount of fees to award a claimant, and the government offers no convincing reason why we should do so.    *Id.*  The government s locality-rate theory is also defective because lawyers don t track the time they devote to litigation based upon the physical location where they perform the work.[7]

---

[7] Judge Wolski noted,  how    is a judge supposed to determine when work is done by people who are in a DC firm, that people come to in DC for work, but they happen to be doing it in some other place where they might be living?   Exhibit 2 (Tr., pp. 97-98).  If  someone like Carter Phillips has an office in Maine where his summer home is, and he s   brought in as the counsel of record to argue a case in the U.S. Supreme Court    the only thing that might happen in DC concerning him is for a half hour he has to stand up before the Supreme Court and then also for a half hour he has to pay attention to what other people are saying before the Supreme Court in the Supreme Court building.  The rest of his time, he learns about the case, prepares for it in his Maine summer home.  Would he then only be entitled to what the rates were for, like, Bangor, Maine, lawyers, even though it s Carter Phillips and

**B.** **The *Davis County* exception to the Forum Rate Presumption does not apply.**

As the party seeking to invoke the *Davis County* exception to the Forum Rate Presumption, the government must first establish that private clients in St. Louis pay lawyers possessing comparable experience their St. Louis lawyers seventy-percent (or more) less than rates private clients in Washington DC pay for comparable representation. *Davis Cnty. v. EPA*, 169 F.3d 755, 758-59 (DC Cir. 1999).[8]

**1.** **Private clients in St. Louis do not pay lawyers of comparable experience seventy percent less than private clients pay comparable lawyers in Washington DC to represent them in comparable litigation.**

The government must first present specific evidence that hourly rates in St. Louis are more than seventy-percent less than the rates private clients pay for comparable representation in Washington DC. The government fails to satisfy this requirement.

*First*, if we accept the government s schedule of proposed St. Louis and Washington DC rates, there is not a seventy-percent difference. See Exhibit 5. The rates the government proposes for St. Louis and Washington DC are, at most, only a twenty-percent difference. Thus, by the government s own admission, the government s *Davis County* argument fails and we need proceed no further.

---

the case because there s only a very small amount of the work that actually requires it to be done in DC? *Id.* at 97. Judge Wolski makes a very valid point.

[8] *Bywaters*, 670 F.3d at 1233 ( the forum rate applies absent some unusual justification for departing from it ); *Garrison v. Sec y of Health & Human Servs.*, 128 Fed. Cl. 99, 108 (2016) (applying the Forum Rate Presumption because the difference between the local rates in Twin Falls, Idaho, and forum rates in Washington, D.C. is not very significant, and stating, The Davis County exception was intended to be limited and apply only to the occasional erratic result where the successful petitioner would be vastly overcompensated. ); and *Masias v. Sec y of Health & Human Servs.*, 634 F.3d 1283, 1290-91 (Fed. Cir. 2011). And, assuming it can first establish that there is a seventy-percent or greater differential between in St. Louis and Washington DC, the government must then establish that all, or virtually all, of the work was actually performed in the substantially lower out-of-forum community. *Avera*, 515 F.3d at 1349.

-9-

*Second*, the government derives its purported schedule of  St. Louis rates  from a scattering of fee awards made in dissimilar litigation involving attorneys and law firms possessing less experience and resources than the owners  counsel.  Furthermore, these fee awards were made many years ago and, most importantly, are not a measure of the prevailing market rate *private clients* pay lawyers of comparable skill and experience.  The Supreme Court says this Court must base an attorney fee upon  specific evidence  that is capable of  meaningful appellate review.   The Supreme Court also says the fee *must* be grounded in the market place of what private clients pay for comparable representation.[9]  The government fails to present *any*  specific evidence  that satisfies the Supreme Court s standard.  Fee awards made years ago in dissimilar cases are not evidence of prevailing rates private clients pay for comparable representation.

*Third*, the rates supposed  St. Louis rates  the government proposes are arbitrary and have no basis in the legal marketplace of actual rates private clients actually pay lawyers in St. Louis for comparable representation.  Catherine Hanaway, former United States Attorney for the Eastern District of Missouri and currently a senior litigation partner with the St. Louis-based Husch Blackwell law firm, affirmatively refutes the government s supposed St. Louis rates.  See Exhibit 6.

*Fourth*, the government s own schedule of supposed  St. Louis rates  refutes the government s *Davis County* argument.  See Exhibit 7 (table comparing the various schedules of  St. Louis  and  Washington DC  rates the government proposed in *McCarty v. United States*, No. 14-316, *Campbell v. United States*, No. 13-324 and *Boyer v. United States*, No. 14-33).

---

[9] In *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989), the Supreme Court declared,  we have consistently looked to the marketplace as our guide to what is reasonable.   The reasonable hourly rate is  calculated according to the prevailing market rates in the relevant community.   *Blum*, 465 U.S. at 895.  The hourly rates employed in the lodestar calculation should  adequately measure the attorney s true market value.   *Perdue*, 559 U.S. at 563.

AFDOCS/15411575.1

*Fifth*, the government s contrived schedule of  St. Louis rates  is refuted by the government s own locality pay rate table.  See Exhibit 8.  The government s own cost-of-living adjustment finds only an eleven percent difference in the salary paid a government lawyer practicing in Washington DC and a government lawyer practicing in St. Louis.  See *id.*

*Sixth*, and finally, the government s arbitrary schedule of hourly rates does not account for the respective lawyer s actual experience.  The government proposes a set hourly rate for all  partners, whether a senior partner with thirty years of experience or a first year partner.  And a single rate for an  associate  making no distinction between an associate that has just graduated from law school or a senior associate with ten years or more of experience.  See Exhibit 4 (Hearne suppl decl.).

In sum, the government s proposed  St. Louis rates  are just numbers the government made up.  The government s  St. Louis  and  Washington DC  rates bear no relationship to the actual market place for legal services.  But, even if we accept the government s  St. Louis  and  Washington DC  rates, these rates actually *refute* the government s attempt to invoke the *Davis County* exception.

> ## 2.    The government cannot demonstrate all the work was performed in a low-rate forum where clients pay comparable lawyers seventy-percent less than in Washington DC.

Because the government has failed to establish the first requirement necessary to invoke the *Davis County* exception (demonstrating a greater than seventy-percent differential in hourly rates between forum rates and out-of-forum rates) we do not need to address the second requirement (that the government must also show all the work was performed in the low-rate out-of-forum community).  But, if we do, the government fails here as well.

The government claims that owners  counsel performed all the work in this litigation in St. Louis.  The government premises this claim on the fact that a secretary in St. Louis sent documents by Federal Express to owners and lawyers in Tampa and St. Petersburg Florida.  See Gov t Brief, p. 7.  The government also looks to an attorney, Lindsay Brinton, who submitted expenses for travel

-11-

from St. Louis to Florida.  Upon this thin reed the government rests its contention that all the work

these owners  counsel performed all of their work in this litigation in St. Louis.

The items the government identifies demonstrate exactly the opposite.  To wit:  the relevant

work was not performed in St. Louis but *in Florida* where the owners live and the property is located.

The government has failed to carry the burden of presenting specific evidence upon which

this Court may invoke the *Davis County* exception to the Forum Rate Presumption.

### C.     The hourly rates used to calculate the unadjusted lodestar fee are consistent with rates prevailing in this forum.

The lodestar fee we request is calculated using the usual rates the owners  law firm, Arent Fox,

charges private clients for comparable representation.  See Exhibit 4.  See also Exhibits 2 and 3 to the

landowners  opening brief (Hearne decl. and Munno decl.); Exhibit 9 (Culverhouse decl.).  Arent Fox s

hourly rates are consistent with, or slightly less than, the hourly rates private clients pay similar

Washington DC law firms.  See Exhibit 7 to the landowners  opening brief (surveys of hourly rates by

National Law Journal and PriceWaterhouseCoopers).  These hourly rates are also consistent with the

*Salazar*-adjusted *Laffey* rates.  See Exhibit 10, a table from Dr. Kavanaugh s declaration comparing the

Arent Fox hourly rate for each lawyer with the corresponding *Salazar*-adjusted *Laffey* rates.  All of this

evidence demonstrates the hourly rates used to calculate the lodestar fee are reasonable and are

consistent with the prevailing rates private clients pay for comparable representation in this forum.

In *Eley v. District of Columbia*, 793 F.3d 97, 100 (DC Cir. 2015), the DC Circuit noted,  [W]e

allow a fee applicant to submit attorney s fee matrices as one type of evidence.   But, the DC Circuit

cautioned  [f]ee matrices in general are  somewhat crude     [f]or this reason fee applicant [must]

supplement fee matrices with other evidence such as  surveys to update the[m]; affidavits reciting the

precise fees that attorneys with similar qualifications have received from fee-paying clients in

comparable cases.     *Id.* at 101.

-12-

The *Laffey*-rates are a schedule of hourly rates for legal services originally established in *Laffey v. Northwest Airlines*, 572 F. Supp. 354, 371 (D.D.C. 1983).[10]  The DC district court, DC Circuit, and Third Circuit have adopted *Laffey*-rates as a  crude  guide and adjusted the schedule of hourly rates for inflation.  The Federal Circuit has likewise recognized the *Laffey*-rates as a basis for establishing a reasonable attorney fee.  See *Bywaters,* 670 F.3d at 1221.  *Laffey*-rates have been adjusted for inflation in two ways.  The first is by reference to the Consumer Price Index (CPI), which measures the cost of consumer goods including  breakfast cereal, milk, coffee, chicken, wine     men s shirts and sweaters, women's dresses, jewelry [and] pet supplies  among other items such as pizza delivery, haircuts and cigarettes.[11]  This method is called the CPI-Adjusted or USAO-Adjusted *Laffey*-rates.  The United States Attorney s Office in Washington DC and the Justice Department once advocated adjusting *Laffey*-rates this way.  We say  once advocated  because, after a series of decisions rejecting the CPI-Adjusted *Laffey*-rates, the Justice Department abandoned this matrix.[12]

The second way to adjust the 1983 schedule of *Laffey*-rates is by reference to the Bureau of Labor Statistics Legal Services Index (LSI).  The LSI, unlike the CPI, is specific to legal services.  The

---

[10] *Aff d in part, rev d in part on other grounds*, *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (DC Cir. 1984), *overruled in part on other grounds en banc in Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (DC Cir. 1988).

[11] See Bureau of Labor Statistics website at:  <http://stats.bls.gov/cpi/cpifaq.htm#Question_7>.

[12] See *Salazar v. District of Columbia*, 123 F. Supp.2d 8 (D.D.C. 2000) (*Salazar I*), *Salazar v. District of Columbia*, 750 F. Supp. 27 70 (D.D.C. 2011) (*Salazar II*); *Salazar v. District of Columbia*, 991 F. Supp.2d 39 (D.D.C. 2014) (*Salazar III*); *Salazar v. District of Columbia*, 30 F. Supp.3d 47 (D.D.C. 2014) (*Salazar IV*); *Salazar v. District of Columbia*, 809 F.3d 58 (DC Cir. 2015) (*Salazar V*), and *Interfaith*, 726 F.3d at 417, n.10; *Eley*, 793 F.3d at 100.

 The Justice Department abandoned the CPI-Adjusted *Laffey*-rates in 2016.  See <https://www.justice.gov/usao-dc/file/796471/download> (copy attached as Exhibit 11).  Dr. Kavanaugh explained why using the CPI to adjust *Laffey*-rates is methodically unsound and why the government s new replacement matrix is also unsound.  See Exhibit 4 to the landowners  opening brief.

DC Circuit, Third Circuit, and DC district court found the LSI to be the more reliable index for measuring legal hourly billing in the Washington D.C. area.

Importantly, the DC Circuit and Third Circuit have *explicitly rejected* the government s CPI-adjusted *Laffey*-rates in favor of LSI-adjusted *Laffey*-rates. In *Salazar V*, the DC Circuit confirmed the superior accuracy of the LSI/*Salazar* rates and found the *Salazar*/LSI Matrix represents *a conservative* estimate of the prevailing rates for legal services, at least for complex federal litigation in the District D.C. Circuit. *Makray v. Perez*, 2016 WL 471271, *5 (D.D.C. Feb. 8, 2016) (citing *Salazar V*). The DC Circuit held that, where the lawsuit involves complex federal litigation, the only issue is whether [plaintiff] submitted sufficient evidence for the . . . court to conclude that the LSI *Laffey* Matrix applies. *Salazar V*, 809 F.3d at 64. The DC Circuit further concluded, The district court s selection of LSI *Laffey*-rates is consistent with this Court s intervening decision in *Eley*. *Id*.[13]

When presented with a similar record to that presented here, the DC Circuit directs the trial court to use the LSI-adjusted *Laffey*-rates to calculate the lodestar fee.[14] The Third Circuit likewise adopted the LSI-adjusted *Laffey*-rates for complex federal litigation in Washington, DC We thus affirm the District Court s use of the LSI-updated *Laffey* Matrix to determine the prevailing rates in

---

[13] Following *Salazar V* and *Eley*, Chief District Judge Howell observed, In light of the D.C. Circuit s recent observation that the *Salazar*/LSI Matrix represents a conservative estimate of the prevailing market rate for legal services in the District, this evidence demonstrates the plaintiff s requested rate is presumptively reasonable. *Makray*, 2016 WL 471271, at *17 (emphasis in original). See also *Hernandez v. Chipotle Mexican Grill, Inc.*, 2017 WL 2804867, at *13 (D.D.C. 2017) ( the Court has little difficulty concluding that the LSI *Laffey* Matrix properly reflects a *reasonable, and conservative*, estimate of the prevailing market rates, for complex federal litigation in the Washington, D.C. area. ) (citing *Salazar V*, 809 F.3d at 65, and *Makray*, 159 F. Supp.3d at 25) (emphasis added).

[14] Plaintiffs submitted a great deal of evidence regarding prevailing market rates for complex federal litigation including the affidavit of the economist Kavanaugh [the same economist whose affidavit supports these owners fee application] explained why the LSI is a better measure of change in prices for legal services in Washington DC than the [CPI-adjusted] update to the Matrix. *Salazar V*, 809 F.3d at 64. Billing-rate tables demonstrating the difference between the CPI-adjusted and LSI-adjusted Laffey-rates, and National Law Journal Rates Surveys showing that rates for partners in Washington DC on the high-end of the market far exceeds the rates in the LSI update. *Id*.

-14-

the Washington D.C. market.   *Interfaith*, 726 F.3d at 416.[15]  See also *Textainer*, 2017 WL 1477148 at

*3.

These landowners submit all that evidence the *Salazar* and *Interfaith* plaintiffs submitted and

more.  In contradistinction to the wealth of support the owners provide for the rates used to calculate

the lodestar fee, the government provides *nothing* to support its assertion that the government s

 USAO-Adjusted  rates are the prevailing market rates private clients in Washington DC pay for

comparable representation.

### D.      The lodestar fee must be calculated using current hourly rates.

The government says it is a violation of  sovereign immunity  to calculate an attorney fee

using current rates.  The government rests this argument upon two unstated premises.  First, that

calculating an attorney fee using current rates is to award  interest  on the attorney fee.  And, second,

the government has not waived its  sovereign immunity  allowing this Court to award a reasonable

attorney fee.  Both of the government s premises are wrong.

The government seeks succor from *Shaw v. Library of Congress*, 478 U.S. 310 (1986).  Judge

Lettow recently explained why the government s argument is wrong to look to *Davis County*.  In *SUFI*

*Network Services, Inc. v. United States*, 128 Fed. Cl. 683 (2016), Judge Wheeler held that attorney fees

should be calculated using current hourly rates.  Judge Wheeler explained why *Shaw* does not compel

a contrary conclusion.

> While [*Shaw*] was controlling at the time of issuance, it has since been undermined by
> Congress  amendment of §1988 to explicitly allow for adjustment of rates for delay.
> 42 U.S.C. §2000-16(d) (2012); H.R. REP. No. 102-40(I), as reprinted in 1991
> U.S.C.C.A.N. 549, 624-25.  Also, later Supreme Court cases have affirmed the change
> in policy that adjustments for delay of payment are appropriate for fee-shifting

---

[15] The Third Circuit is especially authoritative on fee-shifting jurisprudence because the Third Circuit
pioneered the lodestar method.  See *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary
Corp.*, 487 F.2d 161, 168 (3rd Cir. 1973), and *Report of the Third Circuit Task Force on Court Awarded
Attorney Fees*, 108 F.R.D. 237 (1985).

statutes.   In [*Jenkins*], the Supreme Court held that adjustments for delay of payment were appropriate for a §1988 fee-shifting statute.   491 U.S. 274, 284 (1989).   Likewise after *Shaw*, the Supreme Court held that   [w]e do not suggest ... that adjustments for delay are inconsistent with the typical fee-shifting statute.   [*Delaware Valley I*].

This Court thinks very little weight should be afforded [*Shaw*].   The policy behind any fee-shifting statute is to reduce the economic deterrents to contesting unreasonable government actions by holding the Government liable for attorneys' fees and expenses. ... When significant delay in payment occurs, attorneys are discouraged from litigating cases that could result in lengthy delays. Congress disagreed with the decision in *Shaw* because it conflicted with the stated policy of fee-shifting statutes.

The Supreme Court articulated similar reasoning [to Congress in H.R. Rep. No. 102-40, 86]:

> Clearly, compensation received several years after the services were rendered   as it frequently is in complex civil rights litigation   is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings.

*Jenkins*, 491 U.S. at 283.

The statements from Congress and the Supreme Court support the conclusion that adjustments for delay advance the policy behind fee-shifting statutes, while disallowing compensation for delay conflicts with the policy.

   [The plaintiff s] counsel is not justly compensated for work done twelve years ago without an adjustment, but the Government would be rewarded for dragging this litigation out for more than a decade.   The facts of this case fit precisely within the pronouncements of Congress and the Supreme Court for adjusting fee awards to account for delay.   [The plaintiff] is entitled to an award of its attorneys  fees and expenses at current law firm rates to compensate for twelve years of delay.

*SUFI Network Services*,
128 Fed. Cl. at 697-98.[16]

Furthermore, the federal government *did* waive its sovereign immunity.   The URA provides a court rendering a judgment   *shall* determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will   reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including *reasonable* attorney, appraisal, and engineering fees, actually

---

[16] Citations to pleadings and parallel citations omitted.

incurred because of such proceeding.   42 U.S.C. §4654(c) (emphasis added).   A   reasonable   attorney fee paid in 2017 is not calculated using hourly rates from a decade earlier.

Congress adopted fee-shifting statutes to   ensure   effective access to the judicial process   for persons with civil rights grievances.   *Hensley*, 461 U.S. at 429.   The URA, like other civil rights fee-shifting statutes, was adopted because   if the citizen does not have the resources, his day in court is denied him; the congressional policy he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers.   *Riverside*, 477 U.S. at 575.   The Supreme Court   reject[ed] the notion that a civil rights action for damages constitutes nothing more than a private tort suit benefitting only the individual plaintiffs whose rights were violated.   [these cases] vindicate important civil and constitutional rights that cannot be valued solely in monetary terms.   *Id.* at 574. The   important public purpose   of a fee-shifting statute is to   [make] it possible for persons without means to bring suit to vindicate their rights.   *Perdue*, 559 U.S. at 559.   To realize this purpose,   an attorney is [to be] compensated at the rate that the attorney would receive in cases not governed by the federal fee-shifting statutes.   *Id.* at 555.

The Solicitor General recently observed:

> The unique litigation-expense provisions in the [the URA] reflect Congress s intent to make takings plaintiffs whole by requiring the government to cover the reasonable expenses that successful plaintiffs incur in inverse-condemnation actions   . And while most fee-shifting provisions make awards discretionary       [the URA] is phrased in mandatory terms, requiring that courts       *shall* determine and award   a sum to reimburse [the takings] plaintiff   for his reasonable litigation expenses.

> *Haggart v. Woodley*, No. 15-1072,
> United States Brief in Opposition, p. 10.[17]

Fees [awarded under federal fee-shifting statutes] should be neither lower, nor calculated differently, when the losing defendant is the government.   *Salazar V*, 809 F.3d at 65 (quoting *Salazar*

---

[17] Emphasis by the Solicitor General.  Brief available at:  <http://bit.ly/2oJ6JSB>.

*v. District of Columbia*, 991 F. Supp.2d at 49 (quoting, in turn, *Copeland v. Marshall*, 641 F.2d 880, 896 (DC Cir. 1980) (*en banc*)).  Our point is that, to accomplish the purpose for which Congress adopted fee-shifting statutes, the fee must be equivalent to what private fee-paying clients pay lawyers of similar skill and experience to undertake comparable litigation.

Accordingly, the unadjusted lodestar fee should be calculated using the current hourly rates prevailing in this forum and the fee this Court should award should be a fully compensatory attorney fee equivalent to what private clients would pay for comparable representation.  To award less is to frustrate the purpose for which Congress adopted the URA fee-shifting statute.

## III.   The federal government is responsible for the cost of this litigation.

The cost of Trails Act litigation is *not* the fault of those owners whose land the government takes when the STB invokes section 8(d).  The expense of Trails Act litigation lies *entirely* at the federal government s doorstep.[18]

Congress, or the STB, could provide that Trails Act takings are  direct takings  in which owners are paid up-front when the STB originally invokes section 8(d).

> The Government could, of course, have taken appropriate proceedings, to condemn as early as it chose, both land and     easements.  The Government chose not to do so.   thereby putting on the owner the onus of determining the [taking and the burden and expense of  tak[ing] affirmative action to recover just compensation ].

> *United States v. Dickinson*,
> 331 U.S. 745, 747-48 (1947).

But the government did not do this.  Instead the government left it to each individual landowner to learn the government had taken their property and to vindicate their constitutional right to be justly compensated by filing an inverse condemnation lawsuit against the United States.  Once

---

[18] *Preseault v. United States*, 100 F.3d 1525, 1531 (Fed. Cir. 1996) (*Preseault II*) ( we conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government ).

AFDOCS/15411575.1

these owners learned of the STB s order invoking section 8(d) and sought compensation, the government lawyers with the Justice Department could have admitted the government s liability, hired an appraiser, valued the property it took from each owner and offered each owner compensation.  But the government didn t do this.  Instead, the Justice Department opposed these owners tooth-and-nail requiring each owner to sue the United States and independently establish their right to compensation and to then establish the value of that property the government took from each of them.  Now, after almost a decade of litigation, these owners have carried this burden and have prevailed.

The Preseault family endured almost two decades of litigation before they were finally compensated, including multiple trials in this Court, appeals to the Federal Circuit (including rehearing *en banc*), the Second Circuit, the Vermont Supreme Court, and the United States Supreme Court.  And, even after the Supreme Court vindicated the Preseault family s right to be compensated in *Preseault v. Interstate Commerce Commission,* 494 U.S. 1 (1990) (*Preseault I*), the government persisted in its effort to challenge and frustrate the Preseault family s right to receive this compensation.

In 2001 Professor Sharp studied the Justice Department s management of the *Preseault* Trails Act litigation.  See Jeffrey Sharp, *Rails-To-Trails: Rational Governments, and a Constitutional Shortcut, The Perils of Preseault,* 29 REAL EST. L.J. 299 (Spring 2001).[19]

The only explanation for the Justice Department s Trails Act litigation strategy is the notion that if government lawyers can make Trails Act litigation exorbitantly expensive and protract the resolution of Trails Act cases for years or decades, landowners will not seek compensation and no law firm can afford to represent owners in Trails Act litigation.  And, thereby, the government can take

---

[19] See also *Litigation and Its Effect on the Rails-to-Trails Program: Hearing Before the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary,* 107th Cong. 45-54 (2002) (statement of Nels Ackerson); Cecilia Fex, *The Elements of Liability in a Trails Act Taking: A Guide to the Analysis,* 38 ECOLOGY L.Q. 673; and Mark F. (Thor) Hearne, II, *et al., The Trails Act: Railroading Property Owners and Taxpayers for More Than a Quarter Century,* 45 REAL PROPERTY, TRUST AND ESTATE LAW JOURNAL 115, 173 (Spring 2010).

AFDOCS/15411575.1

private property without paying the owner.  If this is the Justice Department s objective, it is not honorable.   We are constantly reminded of the now classic words penned by  [U.S. Solicitor General] Frederick William Lehmann, that the Government wins its point when justice is done in its courts.   *Brady v. Maryland*, 373 U.S. 83, 88 n.2 (1963).

Government lawyers cannot now complain about the cost of this litigation when these same lawyers are the individuals responsible for making the resolution of this litigation costly and protracted. To borrow C.S. Lewis s expression, the government  castrate[s] and bids the geldings be fruitful. [20] We note again the Supreme Court admonition that the  government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by plaintiff in response.   *Riverside*, 477 U.S. at 581, n.11.  For the government to now object to paying those legal fees it caused these owners to incur is like the defendant convicted of patricide throwing himself on the mercy of the court because he is now an orphan.

## CONCLUSION

This Court should order the government to reimburse these owners $1,118,299 in attorney fees and $14,362 in costs and litigation expenses.

---

[20] C.S. Lewis, THE ABOLITION OF MAN, ch. 1,  Men Without Chests  (from THE COMPLETE C.S. LEWIS, Signature Classics, Harper Collins paperback ed. 2007), p. 704.   In a sort of ghastly simplicity we remove the organ and demand the function.  We make men without chests and expect of them virtue and honour and are shocked to find traitors in our midst.  We castrate and bid the geldings be fruitful.

-20-

Respectfully submitted,

*/s/ Mark F. (Thor) Hearne, II*
Mark F. (Thor) Hearne, II
Lindsay S.C. Brinton
Meghan S. Largent
Stephen S. Davis
Abram J. Pafford
Arent Fox, LLP
1717 K Street, NW
Washington, D.C. 20036
Tel:  (202) 857-6000
Fax:  (202) 857-6395
Thor@arentfox.com

112 S. Hanley Road, Suite 200
Clayton, MO 63105
(314) 296-4000

*Counsel for the Landowners*

AFDOCS/15411575.1